Zanone v. State.

┌ 97   101
└117   379

, Zanone   v.   State.

*(Jackson.    June  16,  1896.)*

1. New Trial.  *For error in impaneling jury.*

A new trial will be granted where, over proper exceptions of
the defendant, the Court gave direction, which was obeyed by
the Sheriff, that the jury, without naming them, should be
summoned from the country, entirely excluding the residents
of a city constituting more than one-half of the population of
the county, thereby depriving the accused of his constitu-
tional right to a trial by an "impartial jury of the county."
(*Post, pp. 103–110.*)

Constitution construed: Art. I., Sec. 9.

Cases cited and approved:  Nashville *v.* Shepherd, 3 Bax., 373;
Jackson *v.* Pool, 91 Tenn., 453; 1 How. (Miss.), 243; 2 Dall.
(Pa.), 252; 9 N. Y. Sup. Ct., 156; 31 Hun, 225; 68 N. Y., 528; 48
La. Ann., 194; 48 Mich., 482; 67 Mich., 466; 71 Mich., 291; 13
Col., 515; 22 Pac. R., 817; 16 Grat., 531.

Cited and distinguished: Ellis *v.* State, 92 Tenn., 97.


2. Witness.  *Cross-examination.*

A witness may, for the purpose of affecting his credibility, be
asked on cross-examination about his antecedent specific acts
involving moral turpitude, and he will be compelled to answer
the questions unless they relate to matters of too remote date,
or involve him in a criminal charge where he makes lawful
claim of his personal privilege, but his answers, when made,
are conclusive.   (*Post, pp. 110–119.*)

Cases cited and approved:  Franklin *v.* Franklin, 90 Tenn., 49;
.Braswell *v.* State, 3 Leg. Rep., 283; Peck *v.* State, 86 Tenn.;
259; Hoard *v.* State, 15 Lea, 323; Boyd *v.* State, 94 Tenn.. 505;
Rocco *v.* Parczyk, 9 Lea, 331.

Cited and distinguished: Hill *v.* State, 91 Tenn., 521; Ford *v.*

Ford, 7 Hum., 92; Gilliam *v.* State, 1 Head, 38; Merriam *v.* State, 3 Lea, 394; Clapp *v.* State, 94 Tenn., 202.

FROM  SHELBY.

Appeal in error from Criminal Court of Shelby County.    L. P. Cooper,  J.

George Gantt and Peters & Norfleet for Zanone.

Attorney-general Pickle and Eldridge E. Wright for State.

John T. Allen, Sp. J.    The defendant was indicted for the murder of George Tait, and was tried and convicted of murder in the second degree, and his punishment fixed at twenty years in the penitentiary. The State's theory is that the killing was the result of malice, growing out of the fact that, in November, 1894, George Tait, the deceased, was summoned as a witness before the Grand Jury, and gave evidence, which resulted in an indictment against A. Zanone, father of defendant, for' selling liquor contrary to law.    The defense is on the theory that the origin of the trouble, which culminated in the killing of George Tait, on January 24, 1895, by defendant, was much earlier in point of time, and that the deceased was wholly in fault, and that de-

ceased brought about the difficulty with defendant, in which he lost his life.

Deceased, at the time of his death, was about thirty years of age, and was a street car conductor, and defendant was about nineteen or twenty years of age, and was engaged as clerk, in his father's grocery, which was situated near the east end of the electric car line, running from the custom house, in the City of Memphis, to Montgomery Park (race track grounds), about four and one-half miles from the city. Prior to November, 1894, the deceased usually stopped his car in front of Zanone's grocery, and had the other cars on that line to stop there as a regular stopping place, but, after that, deceased quit stopping his car in front of Zanone's, and had his car and the other cars to stop in front of Slagle's grocery.

There is proof in the record tending to establish the theory of the State, and also of the defendant, but we refrain from expressing any opinion on the facts, as the case must be reversed and remanded for a new trial, on account of errors in the ruling of the Court trying the case.

The first error assigned by defendant is as follows:

"The Court committed error in ordering the Sheriff to summon the special venire, to try the defendant, entirely from the country, and not to summon any of them from the city of Memphis, and the Sheriff accordingly summoned the venire entirely from the country districts, and every citizen of

Memphis, where the majority of the population of Shelby County resided, was excluded from it.''

It does not appear in the order of the Court on the minutes that the Sheriff was ordered to summon the venire from the country, but it appears in the bill of exceptions, and in the opinion of the Criminal Court Judge, delivered by him in overruling the motion for a new trial, that he instructed the Sheriff and his deputies to summon the entire venire from the country and not to summon any of the jurors from the city of Memphis, and, according to these instructions from the trial Judge, a venire of 355 men were summoned by the Sheriff and his deputies from the country, and none of them from the city of Memphis. The defendant, on this account, duly challenged the array, and moved to quash the venire, which motion was overruled by the Court, and defendant duly excepted to this ruling of the Court. The killing of George Tait by the defendant occurred in the Fourteenth Civil District of Shelby County, near the race track, about four miles from the city of Memphis.

Memphis has a population of about 70,000, and the country districts in the county have a population of about 60,000.

His Honor, without designating the names of the jurors to be summoned, and without any application or any reasons assigned therefor, directed the Sheriff to summon the entire venire from the country, to the exclusion of the resident citizens of Memphis

who might qualify as jurors to try defendant. But, after the verdict, on motion for a new trial, his Honor gave as a reason for directing the entire venire from the country that the case had been tried before, which resulted in a mistrial, and a full report of the testimony given in · on that trial had been published in the city papers, and for this reason the Court gave the instructions to obtain the venire from the country. Also, in another case, he had had trouble in securing a jury from the city of Memphis, and, from his experience, he thought it would be next to impossible to get a jury from the city of Memphis.

It appears that on the first trial referred to by his Honor, that the jury, who sat upon the case then, were all from the country, and no effort was made to get any of the jurors from the city of Memphis.

It is here insisted by defendant's counsel that this action of the trial Judge, and his reasons therefor, as subsequently given, are without legal sanction, and that the defendant did not have tendered to him as his triers a fair and impartial jury, drawn from the body of the county, as guaranteed to him by law. The Constitution of Tennessee provides that the accused shall have ''a speedy public trial by an impartial jury of the county.'' At the early common law the jury came from the *visne* or neighborhood or hundred in which the offense occurred, because such a jury were supposed to be more inti-

mately acquainted with the merits of the contro-
versy, and therefore were better qualified to do jus-
tice in the premises than mere strangers; but by
statute, in England, it was subsequently provided
that the jurors should be taken from the body of
the county.    Thompson & Merriam on Juries, Secs.
1 and 2; *Shaffer* v. *State*, 1 How. (Miss.), 243.

A similar provision is found in all of the State
Constitutions, and the right of a trial by a jury of
the county, or from the body of the county, is
guaranteed.    This right has, from the earliest times,
been regarded as "one of the greatest securities of
life, liberty, and property of the citizen."    *Ib.*

Now, looking at the decisions of the Courts in
other States on this question: In Pennsylvania, in
*Hartshorn* v. *Patton*, 2 Dall. (Pa.), 252, the Court
held that a jury could not be selected, by order of
the Court, from the country, to the exclusion of
the city.    The case had been repeatedly tried, with
constant mistrials, and, in order to obtain a jury
whose minds were unbiased by reports, discussions,
and conversations regarding the controversy, the Court
was requested to direct a panel from the country,
exclusive of the city.    The Court said: "Can we
direct the Sheriff to take a jury from any partic-
ular part of the county?    Surely not."

In New York, in the case of *Gibbons* v. *Van
Alstyne*, 9 N. Y. Sup. Ct., 156, the parties were
both farmers.    The Justice instructed the Constable
to summon all farmers, to get a farmer's jury, and

not to summon any of the jury from the village. This was held unlawful, if it were shown that the Constable summoned the jury according to this in-. struction. As this did not appear, the Court held it would let the presumption prevail that the Constable did his duty, and did not follow this instruction in summoning the jury. The Court held that it was an improper instruction for the Justice to give, and said: "The Constable should have been left entirely free and independent to summon an impartial jury, without reference to any particular class of men." And referred to *People* v. *Kelly*, 31 Hun, 225; *Mandeville* v. *Reynolds*, 68 N. Y., 528.

A similar doctrine has been held in several of the other States. *Shaffer* v. *State*, 1 How. (Miss.), 243; *State* v. *Nash*, 48 La. Ann., 194; *People* v. *Hall*, 48 Mich., 482; *People* v. *Coughlin*, 67 Mich., 466; *Hewitt* v. *Circuit Judge*, 71 Mich., 291; *Babcock* v. *People*, 13 Col., 515; and *Babcock* v. *People*, 22 Pac. R., 817; *Wash* v. *Commonwealth*, 16 Grat., 531.

For the Judge, clerk, or other officer of the Court to direct the Sheriff to discriminate in the selection in favor of or against any class of citizens eligible to jury duty, is held generally by the Courts to be a grievous wrong, and that such practices are unlawful, and when the Sheriff follows such orders and instructions in summoning jurors, the panel should be quashed and discharged when the array is challenged.

His Honor, the Criminal Court Judge, held that this question was determined by the case of *Ellis* v. *State*, in eighth Pickle, and, as conclusive, quotes this language of the Court: "If the jury is made up of citizens of any part of the county, who are otherwise qualified, the requirement of the Constitution is complied with." This decision does not apply here. In that case an Act of the Legislature created a Court with jurisdiction over certain districts in Roane County, providing that the jurors should be selected from those districts within · its jurisdiction. The Act was claimed to be unconstitutional, because these jurors were not summoned from "the body of the county." This Court held, that a jury summoned from that portion of the county within the jurisdiction of the Court was lawful, using the lan-. guage above quoted. 8 Pick., 97.

In this State, in the case of *Mayor and City Council of Nashville* v. *Charles . Sheperd*, 3 Bax., 373, the Court ordered a jury to consist of one-half white men and one-half colored men, and this Court said: "We regard this as so fundamentally erroneous, and so likely to lead to mischievous consequences and pernicious results, that we feel constrained to reverse the judgment." And, in the case of *Jackson* v. *Pool*, 7 Pickle, 453, the Court ordered the Sheriff to summon as jurors, on a special venire, citizens from the country, and not to summon any taxpayers or residents of the city of Jackson. This was held to be erroneous. Judge Lea,

Zanone v. State.

delivering the opinion of this Court, said: "The law, in its provisions for a special jury, contemplates the selection of men with reference to their superior fitness to try or determine the particular issues involved in the case, but he cannot direct the Sheriff, where all are equally competent, not to summon those whose residence is within the city limits, but to summon only those who reside beyond the city limits, any more than he can authorize him to summon those citizens only of German descent, and not to summon those of Irish descent, or to authorize him to summon negroes and not to summon white men."

From the foregoing authorities, it is manifest that the action of his Honor in instructing the Sheriff and his deputies to summon the jurors from the country entirely, whereby more than half of the citizens of Shelby County were excluded from the venire, and the jurors summoned on the venire came from a particular part of the county designated by the Judge, was illegal, and, the panel being unlawful, should have been quashed and discharged when challenged by the defendant.

The Sheriff should have been left free and independent to summon an impartial jury from the County of Shelby, without reference to any particular class of men, and without reference to any particular part of the county. The trial Judge would have as much right to have instructed the Sheriff to summon a venire of three hundred Ital-

ians, and not to summon men of German or Irish descent, or to summon on the venire only men from one particular district of the county, or from a particular ward in the city of Memphis, or to summon all white men, or half of them white and the other half colored men, which would have been unlawful. When a panel is thus selected, and there is a plain departure from and violation of the legal mode of summoning the panel, it is unnecessary to show injury to the defendant. The Court will presume injury to him to the extent that he has been deprived of his legal rights in the manner of selecting jurors, and the conviction will be void, and a new trial will be granted him.

The third assignment of error is as follows:

"The Court erred in its rulings excluding the questions propounded on cross-examination by the defendant to the State's witnesses—A. G. Slagle, Dessie Slagle, and Carrie Brown—and answers sought thereto," which questions are as follows:

Mrs. Dessie Slagle was the first witness for the State. The record shows that the following questions were asked her on cross-examination, and were excluded by the Court: "How many times have you been married?" "How many times have you been married to Mr. Slagle?" "How many living husbands have you?" "Did you not, while married to Cooper, cross over the Mississippi River, marry Slagle in Arkansas, immediately return to the city of Memphis, and reside there with two husbands—

Cooper and Slagle?" "Did you not, also, at that
time, know that Slagle had a living wife?" "Did
you not, immediately thereafter, or soon thereafter,
go back and live with Cooper, and have Alexander
Slagle indicted in the Criminal Court of Shelby
County because he had married you, being the wife
of Cooper?" The indictment referred to against
Alexander Slagle for knowingly marrying Dessie
Cooper, the wife of Archie Cooper, was tendered,
and the witness was asked "if that is not the suit
against her husband for marrying her which she
prosecuted."

Again, she was asked if she did not have Mar-
tin Kensey, Archie Cooper, W. L. Smith, and A.
G. Slagle, four husbands, all at the same time.
"Did not your husband, Alexander Slagle, in the
city of Memphis, in your own room, shoot at a
man because of his intimacy with you?" "Did
not your husband, Archie Cooper, leave you and
leave the city of Memphis because of your intimacy
with other men?" "Have you been impeached as
a witness in any court?" "Have you had or not
witnesses to swear that they would not believe you
on oath?" "Have you not recently torn the
clothes, or the shirt, off of your husband, A. G.
Slagle, drawn a butcher knife on him, called him
a damned son of a bitch, and said you were going to
kill him?"

Upon being recalled, she was tendered the record
in the divorce case of *Dessie Slagle* v. *A. G. Slagle*,

and was asked if she filed the bill and made the allegations it contained, and if there was not a cross bill, and if she did not file the answer thereto as it appears in the case. Also, the following: "Alexander Slagle is charged in the indictment with knowingly marrying Dessie Cooper, the wife of Archie Cooper. I wish to ask the witness if she is the Dessie Cooper therein mentioned." "And was not the verdict of 'not guilty' entered in the case before the trial, because she, the witness, had quit Cooper, and had got back and was then living with Slagle, and if that was not the reason the verdict of 'not guilty' was entered?"

The Court was apprised that the answers would be such as to bring the witness into disrepute and lower the standard of her moral character. The ruling excluding them was not based on the fact that the Court was not aware of the nature and character of the answers the witness would give, but that it was not competent to assail the credit of a witness by such questions and the answers thereto.

The following questions were asked of A. G. Slagle, and excluded by the Court, viz.: "Here is an indictment against you for an assault and battery on one Dessie Cooper. I want to ask you if Dessie Cooper at that time was not the lady who testified here this morning, and if she wasn't your wife, and if the charge against you wasn't that of beating your wife?" The witness was then asked if

he had not been indicted for wife-beating in this Court, or for assault and battery on his wife, and if Dessie Cooper was not then, and in 1888, his wife.

After reading the indictment charging him with marrying Dessie Cooper, then the wife of Archie Cooper, the witness was asked, "Who is Dessie Cooper?" "If Dessie Cooper was not then the wife of A. W. Cooper, and isn't she the woman that is now living with 'you, your wife?" "Was not Dessie Cooper, upon whom you are alleged at that time to have committed· this assault and battery, then your wife, and if this was not after the marriage, or the alleged marriage, in Arkansas?" "Mr. Slagle, really, could you tell the jury how many wives you have at present?" "I want to know if you haven't one wife living in Memphis and one in Washington City?" "And you have a divorce proceeding pending against you now, haven't you?"

Also the following questions were asked the witness, Carrie Brown, colored, viz.: "How many times have you been on the rock pile?" And, after referring to bawdy houses, "Were not the women who kept these houses arrested because they were charged with keeping you there when you were too young to be there?" "And, further, wasn't your business in these bawdy houses that of playing the piano?"

The trial Judge excluded all these questions to these several witnesses, and the answers sought to

13 P—8

be elicited, upon the ground, as stated by his Honor, that the Hill case settled the law of Tennessee 'on the question, and his Honor said: '' I shall not let, on cross-examination, the domestic relations or domestic troubles, or anything of that sort, be brought out of any witness, or any particular facts that would tend to disgrace or reflect upon the witness.''

In the case of *Hill* v. *State*, 7 Pick., 522, the defendant, when being cross-examined as a witness, was asked and required to answer, over objection, ''if he had not been charged with stealing money from a negro in Huntingdon, and if he did not pay him back the money.'' Defendant answered he had been charged with the offense, and .had paid the party some money to keep his father from hearing of the charge against him, but there was no truth in the charge. This Court held (Judge Caldwell delivering the opinion) that, as ''great as the latitude of cross - examination is, it does not warrant the investigation of mere personal imputations, which may be easily instigated and multiplied by unscrupulous persons, to the injury or destruction of any witness,'' and that the witness' denial of the truth of the charge was conclusive, and should have ended that matter to all intents and purposes; that the trial Judge erred in permitting the question to be asked in the shape that it was put, and by instructing the jury that they could look to it as affecting the credibility of the witness, after the truth of the charge had been

denied by the witness.    This was all that was set-tled in the Hill case.

The questions propounded the witnesses, on cross-examination, in the case at bar, are altogether different from the question propounded in the Hill case. Here these witnesses were asked about specific acts, relating to their conduct, antecedents, and character, involving moral turpitude, for the purpose of affecting and injuring the credibility of the witnesses, and they were not inquiries about personal imputations or charges made against the witnesses.    Our decisions hold:

1. That independent evidence introduced by the opposite party to impeach a witness, must relate to general reputation, and that specific acts cannot be shown.    *Ford* v. *Ford*, 7 Hum., 92; *Gilliam* v. *State*, 1 Head, 38; *Merriam* v. *State*, 3 Lea, 394.

2. But that on cross-examination of a witness, we think specific acts, including indictments involving moral turpitude, may be asked about, which disclose his conduct, antecedents, and character, and thereby tend to affect and injure his credibility, although they may reflect upon and disgrace the witness; and the answers of the witness to such collateral matters are conclusive, and not to be contradicted.    *Franklin* v. *Franklin*, 6 Pick., 49; *Rocco* v. *Parcyzk*, 9 Lea, 331; *Hill* v. *State*, 7 Pick., 521; *Boyde* v. *State*, 10 Pick., 505; *Braswell* v. *State*, 3 Leg. Rep., 283; *Clapp* v. *State*, 10 Pick., 202; *Hoard* v. *State*, 15 Lea, 323; *Peck* v. *State*, 2 Pick., 259.    It was con-

sidered admissible to show by one witness that she
was a lewd woman. *Hoard* v. *State*, 15 Lea, 323.
And to ask a witness whether he had not committed
forgeries, and was not addicted to the excessive use
of morphine and whisky, was allowed. *Franklin* v.
*Franklin*, 6 Pick., 49. And so, whether the wit-
ness had not been indicted for an infamous crime.
*Hill* v. *State*, 7 Pick., 523; *Braswell* v. *State*, 3
Leg. Rep., 283. And so, whether he had been ar-
rested for theft, or in prison on other charges, ap-
proved. *Peck* v. *State*, 2 Pick., 259. There is
this qualification to the rule: If the witness is asked
as to any crime, he may claim his privilege from
self-incrimination and protect himself from a crim-
inal prosecution by refusing to answer. *Clapp* v.
*State*, 10 Pick., 202.

Judge Snodgrass, in delivering the opinion of this
Court in the case of *Boyd* v. *State*, quotes approv-
ingly from a New York decision the following lan-
guage, to wit: "The better rule now is, that, upon
cross-examination, questions as to specific acts, tend-
ing to disgrace the witness, and not questions as to
accusations or charges, including indictments, may be
asked on cross-examination, but the party asking
them is bound by the answers of the witness." 10
Pickle, 511. But the rule has not been definitely
settled in Tennessee as to what extent questions of
this character are allowed, except as to questions
relating to indictments for offenses involving moral
turpitude, the cases permit them to be asked about.

Zanone *v.* State.

*Braswell* v. *State,* 3 Leg. Rep.; *Hill* v. *State,* 7 Pickle, 521.

The case at bar presents the question as to what scope should be allowed on the cross-examination of witnesses touching their character, and, after a careful consideration of this question, we think it clear, upon the authority of our own decisions and the decisions in other States and the best text-writers, that the inquiry on cross-examination may go the extent of asking about any specific acts of the witness involving moral turpitude, and the witness may be compelled to answer the questions, unless the questions involved a criminal offense for which the witness may be prosecuted, and, in that case, "the witness is permitted to judge for the most part for himself, and refuse to answer wherever it would tend to subject the witness to criminal punishment or forfeiture. Here the Court must see for itself, when the witness claims the privilege of not answering, that the answer will directly show his infamy or crime, before it will excuse him from testifying." If the offense inquired about is barred by the statute of limitations from criminal prosecution, then the witness could not claim the privilege of not answering.

There is no good reason why a witness may not be asked, on cross-examination, "questions touching his present situation, employment, and associates, if they are of his own choice—as, for example, in what house or family he resides, what is his ordinary occupation, and whether he is intimately ac-

quainted and conversant with certain persons, and the like. However these may disgrace him, his position is one of his own selection.'' A witness, on cross-examination, may be asked any questions throwing light on his or her moral character, provided they involve moral turpitude, whether they relate to domestic relations or other habits, if the tendency is to show that the witness is guilty of wanton habitual violation and disregard of the most sacred marital relations, or of the law, or of the rules of decent society, involving the witness in moral turpitude—as, for example, if the witness has more than one living husband, or more than one wife, at the same time, or if the witness has been or is then employed in a house of ill fame.

Mr. Greenleaf says: ''The examination being general and kept within bounds by the discretion of the Judge, all inquiries into transactions of remote date will, of course, be suppressed, for the interests of justice do not require that errors of any man's life, long since repented of and forgiven by the community, should be recalled to remembrance and their memory be perpetuated in judicial documents, at the pleasure of any future litigant. The State has a deep interest in the inducements to reformation held out by the protecting veil which is thus cast over the past offenses of the penitent. But where the inquiry relates to transactions comparatively recent, bearing directly upon the present character and moral principles of the witness, and, there-

fore, essential to the due estimation of the testimony by the jury, learned Judges have of late been disposed to allow it." Sec. 459, Vol. I. (15 Ed.), Greenl.

It is obvious that the tendency of the above questions was to bring out specific facts from these witnesses on their cross-examination, which, if true, would have tended to involve their moral characters and to show them guilty of moral turpitude in their conduct and habits. And while some of said questions related to transactions which are not of comparatively recent date, other questions of a similar import were put to the same witness, in the series of questions asked, tending to show a continuation of the immoral conduct of the witness to within comparatively recent date, bearing directly upon the present character and moral principles of the witness, and all of these acts and transactions inquired about, were essential to the due estimation of the testimony of the witnesses, Mrs. Dessie Slagle, A. G. Slagle, and Carrie Brown, by the jury, and were admissible, no privilege from not answering having been claimed as to such questions as might have involved the witnesses in criminal prosecutions.

For these errors the judgment is reversed, and the case is remanded for a new trial.