## ARTHUR and FRANK TUCKER *v.* THE STATE.

### (*Jackson.*   April Term, 1923.)

1. **WITNESSES.** Cross-examination of character witnesses as to specific acts of defendant limited to testing their accuracy and credibility.

   While a character witness for defendant in a criminal case may be cross-examined as to specific acts and conduct of defendant, this is only to test the accuracy and credibility of witness, and the evidence thus developed is not substantive evidence of defendant's good or bad character. (*Post, pp.* 112-116.)

   Case cited and distinguished:   Moulton v. State, 88 Ala., 116.

2. **CRIMINAL LAW.** Witnesses. Defendant's bad reputation after crime incompetent as to his character or to test character witnesses.

   Questions as to wrongful acts or bad reputation of defendant in a criminal case, subsequent to the crime for which he is being tried, are incompetent on the question of defendant's character or to test the credibility of character witnesses. (*Post, pp.* 116-120.)

   Cases cited and approved:   People v. Dogett, 62 Cal., 27;   Kee v. State, 28 Ark., 155;   Young v. Com., 6 Bush, 312;   Brown v. State, 46 Ala., 175;   Lea v. State, 94 Tenn., 495;   Moore v. State, 96 Tenn., 209;   State v. Johnson, 60 N. C., 151;   Zanone v. State, 97 Tenn., 101;   Ford v. Ford, 26 Tenn., 92;   Merriman v. State, 71 Tenn., 394;   Gilliam v. State, 38 Tenn., 39.

   Cases cited and distinguished:   Lea v. State, 94 Tenn., 495;   Moore v. State, 96 Tenn., 209;   Powers v. State, 117 Tenn., 363.

3. **WITNESSES.** Relative to cross-examining character witnesses, number from whom they have heard of specific acts of defendant, immaterial.

Tucker v. State.

For testing accuracy and credibility of character witnesses for defendant in a criminal case, they may be cross-examined as to what they have heard as to specific acts and conduct of defendant, irrespective of the number from whom they have heard it. (*Post, pp.* 120, 121.)

Case cited and approved:   Pickens v. State, 61 Miss.. 566;  Ex parte Marshall, 207 Ala., 566.

4.  CRIMINAL LAW.  Instructions to consider all the evidence against defendants' general reputation held erroneous.

Where a large part of the damaging evidence adduced on cross-examination related to the character of defendants since the crime for which they were being tried, it was error, especially in view of erroneous rulings as to such evidence, to charge the jury generally to "consider all the evidence both for and against their general reputation," without, distinction between their general character and reputation before and after the crime, though there was no request that such distinction be made. (*Post, pp.* 122, 123.)

5.  CRIMINAL LAW.  Errors in ruling and instructing as to evidence of reputation after the crime held prejudicial.

Error in ruling and instructing as to evidence of reputation of defendants in homicide since the crime *held*, in view of the circumstances surrounding the case, reversible error, notwithstanding Public Acts 1911, chapter 32, section 1, limiting reversals for error. (*Post, pp.* 123-125.)

Case cited and approved:  Frank v. Wright, 140 Tenn., 535.

Case cited and distinguished:  Railroad v. Morgan, 132 Tenn., 1.

FROM DYER.

Error to the Circuit Court of Dyer County.—HON. ROBERT A. ELKINS, Judge.

Tucker v. State.

E. T. WEAKLEY and W. S. DRAPER, for plaintiffs in error.

W. H. SWIGGART, JR., Assistant Attorney-General, for the State.

MR. MALONE, Special Judge, delivered the opinion of the Court.

The plaintiffs in error (hereinafter called the defendants) were indicted for the killing of one Russell Hughey, and were found guilty of murder in the first degree, with mitigating circumstances—the jury fixing their punishment at imprisonment for life. Their motion for a new trial having been overruled, they have appealed to this court, and have assigned numerous errors.

Without undertaking at this point to discuss the facts of the case, it may be stated that the defendants and the deceased, Russell Hughey, were distantly related, and were neighbors. Hughey had undertaken to purchase some land from the father of defendants, and litigation had arisen over this purchase.

It appears that a deed had been drawn up by Mr. Ralph Rice, an attorney, of Dyersburg, conveying the land to Hughey. The defendants below contended, and Mr. Rice so testified, that Hughey did not pay the cash consideration mentioned in the deed, but that it was understood that the deed should be held by him (Rice) until a loan could be obtained from an insurance company; that on account of a defect in the title this loan was not, in fact, obtained; that Rice wrote some sort of a collateral agreement to this effect—the substance being that the deed was to remain in full force and effect, provided the loan was ap-

Tucker v. State.

proved and the money obtained, and, if not, that the deed was to be returned; that after the failure to obtain the loan he (Rice) retained the deed in his possession; that some time thereafter Hughey came and asked for the deed, and he, Rice, had forgotten the collateral agreement, and delivered it to him. In a litigation about some posts Hughey produced this deed.

When he was killed, Hughey was attempting to fence in a part of this land for a hog lot, and was engaged in digging post holes. The defendants Frank and Arthur Tucker had previously sowed clover in the field, and were claiming it as theirs. The homicide occurred on the 24th day of May, 1921, at about 9 o'clock in the morning. The deceased received two wounds—one bullet entering the left side and one the mouth.

As above stated, Hughey, just previous to the encounter, was engaged in digging post holes. The defendants, Frank and Arthur Tucker, were plowing some of their father's land. In a neighboring field Harmon Hughey, brother of the deceased, and a fifteen-year-old boy, Walter Shepherd, were engaged in plowing.

All the foregoing facts are practically undisputed, but as to the facts of the actual homicide there is a sharp conflict in the evidence.

The theory of the State, supported by the evidence of Harmon Hughey and his employee Walter Shepherd, is that the two Tucker boys walked over to where the deceased was digging post holes, drew their pistols, and shot him down—one shot being fired after he fell. They claim that the deceased was unarmed, and made no demonstration of any sort against the Tuckers.

It may be observed here that there is a rather material discrepancy in the testimony of the State's principal witnesses—Harmon Hughey stating that the two defendants stood one on the one side and one on the other of the deceased, and shot him; while Walter Shepherd states that the defendants stood side by side, both facing the deceased, and thus shot him. The State undertakes to explain this by insisting that the different angles from which these two witnesses viewed the shooting is the cause of this conflict, which (the State contends) is apparent rather than real. Harmon Hughey, according to the State's evidence, was about eighty or ninety steps distant, and Walter Shepherd about one hundred steps. Neither of the State's witnesses claim to have seen a pistol in the hands of any participant in the killing, but they testify that they saw both the Tucker boys extend their arms, and saw the smoke of the shots, and that both of the Tuckers were shooting.

The defendants state that as soon as they saw Hughey fencing their clover field they went over to discuss the matter, or to remonstrate with him; that Arthur Tucker had a pistol, but Frank Tucker had none; that after a brief exchange of words over the ownership of the land the deceased called Arthur Tucker a damned liar, and immediately drew a pistol and began to shoot; whereupon Tucker did the same until he had emptied his pistol; that the deceased drew and fired his pistol with his left hand; that Frank Tucker took no part in the shooting; that he, Arthur Tucker, received three wounds at the hands of Hughey, two bullets grazing his face, and one passing through the shoulder.

It is the State's contention that the Tuckers stood on opposite sides of Hughey, and that Arthur Tucker was wounded by his brother Frank. The State further insists that Russell Hughey did not own a pistol, and by reason of stiff fingers on both his right and left hands was practically incapable of shooting a pistol. The State further insists that the deceased was suffering with inflamed eyes, and could hardly see at the time of the encounter.

To offset these contentions the evidence introduced on behalf of defendants tends to show that the father of Russell Hughey, the deceased, when he arrived at the scene of the killing, asked about Russell's pistol, and was told to "hush" by Harmon Hughey; that some months after the killing, and shortly before the trial, on burning the weeds near the point of the encounter a rusted pistol with four cartridges discharged, and the muzzle caked with mud, was found by the father of the defendants in company with several other people who were then searching for the pistol. The defendants' evidence tends to show that the deceased, Russell Hughey, owned a pistol of this make. The defendants' evidence further tends to show that the deceased could see well at the time of the encounter; that he was performing his usual tasks; that the post holes were perfectly aligned, etc.

It thus appears that numerous controverted and closely contested issues were presented to the jury, and that the defendants themselves were their only witnesses as to the facts of the homicide.

Certain assignments of error question the charge of the trial judge on the subject of character evidence, and also

his rulings on questions asked by the State in cross-examining character witnesses introduced by the defendants.

1.   A number of witnesses introduced to prove the good reputation of the defendants for truth and veracity, and for peace and quiet, testified, in substance, that their general reputation in both respects was good up to the time of the homicide.   On cross-exanination the State sought to develop evidence of specific wrongful acts, and also that it was a part of their general reputation, since the homicide, that they had been engaged in the illicit manufacture and sale of whisky.   The defendants insist that the trial judge allowed specific acts of the defendants to be inquired about, instead of confining the testimony to general reputation; that he failed to discriminate between the general reputation of the defendants, up to the time of the alleged crime, and their reputation thereafter; and that the effect of these rulings was to destroy the credibility of the defendants, as witnesses, and prejudice them in the minds of the jury—it being contended in the brief of the defendants' able counsel that "it is a greater offense to sell whisky or manufacture whisky in the eyes of many of the jurors in this county than to rob a bank or to commit murder."

It is insisted by the State that the objections made to the rulings of the trial judge were not specific, and in many cases this was so.   In other cases, however, specific objection was made, and on the whole record we are convinced that the attention of the trial judge was sharply challenged to the competency or incompetency of the evidence, and that he understood and rejected the theory of the defendants.

Tucker v. State.

To give an idea of the questions raised, we will quote excerpts from the examination of some of the witnesses.

Thus R. B. Worley, a witness for defendants, who on direct examination had testified that the character of Arthur Tucker was "fairly good so far as I know, up until this," was cross-examined as follows:

"(1)  You said you were acquainted with the reputation of Arthur Tucker?  A.  Yes, I think I am.

"(2)  Don't you know that it is a part of his reputation in that neighborhood where he lives that he is selling liquor?  A.  Up until this occurred, I said.

"(3)  I am asking you up until now?  A.  Yes.

"Mr. Draper:  I insist it isn't competent to ask what a part of his reputation is, if he has got a reputation he had got it.

"By the court:  Let the objection be overruled.  (Defendants except to the ruling of the court.)

"(4)  Isn't it a part of his reputation that he is selling whisky?  A.  I have heard that.

"Mr. Draper:  We except to that, what he heard, and ask your honor to withdraw it from the jury.

"By the court: Let the objection be sustained.

"(5)  A man's reputation is what people say about him, not what you know personally.  Now isn't it a part of his reputation that he is selling whisky and moonshining?  A.  I have heard that since this trouble occurred.

"(6)  Can't you answer the question 'Yes' or 'No'?  A.  What was the question?

"(7)  Isn't it a part of his reputation down there that he is selling whisky, bootlegging, and moonshining?  Now you answer that question 'yes' or 'no.'

"Mr. Draper: He has no right to instruct the witness how to answer the question.

"I have heard it is all I can say.

"Mr. Draper: We except to that, and ask your honor to withdraw it from the jury.

"By the court: Let the objection be sustained. Now listen to the question.

"(8) Isn't it a part of his reputation that he is moonshining and making whisky?

"(Objected to by the defendants. Objection overruled by the court, to which ruling defendants except.)

"(9) Answer the question? A. I have heard that.

"Mr. Draper: We object to the answer, and ask your honor to withdraw it from the jury.

"By the court: Let that objection be sustained. Now answer the question if you know and if you don't know say so. A. I don't postively know it.

"(10) I am not asking what you know yourself personally, but isn't it a part of his reputation that he is moonshining? A. Yes, it has been talked.

"Mr. Draper: We object to that answer, he shows it is hearsay.

"By the court: He said that was talked—what did you say? A. I said I had heard that on him.

"By the court: Was that the answer you gave a while ago? A. I suppose it is part of his reputation, I have heard that.

"(Objected to by defendants. Objection overruled by the court, to which ruling of the court defendants except.)"

While, as will be observed, the rulings of the court seem somewhat confused, if not contradictory, the idea of the

Tucker v. State.

trial judge seems to have been that any specific acts could be made the subject of inquiry, provided they were asked about as part of the general reputation; and that the answers could be considered by the jury as substantive evidence of the general reputation of the defendants.

This is further illustrated by his suggestion to the attorney-general during the cross-examination of the witness D. A. Freeman, viz:

"By the court: Ask him if it was a part of his reputation that he was engaged in selling whisky?"

The cross-examination of another witness for defendants, Frank Miller, further illustrates the views entertained by the trial court on this point. We extract the following:

"(1) Isn't it a part of Frank Tucker's reputation that he cut his brother Luther? A. I heard it.

"Mr. Draper: We object to that.

"By the court: When you offer the witness to prove the defendant's reputation is good it is competent for the State to inquire into specific acts, isn't it?

"Mr. Draper: I don't think it is, and especially when it is hearsay.

"By the court: Isn't it competent to inquire into specific acts when you prove his reputation for peace and quietude.

"Mr. Draper: I don't think it is, and specially when it is hearsay.

"By the court: If he knew of the specific acts of violence—find out if it is his reputation.

"Mr. Draper: We except to the ruling of the court.

Tucker v. State.

"(2) I asked you if it isn't a part of his reputation that he did assault his brother Luther Tucker?

"A. I heard it; I don't know it to be true.

"(3) I never asked you if you knew it to be true, but I asked you if it isn't generally understood in the community that he did assault his brother Luther Tucker?

"Mr. Draper: We except to that.

"(4) That he did cut up his brother?

"By the court: If it is a part of his reputation say 'Yes,' and if it isn't a part of his reputation say 'No.' A. I heard it talked in the neighborhood.

"By the court: No; if it isn't a part of his reputation say 'No.' A. Do you mean a part of his reputation now?

"By the court: No, at any time? A. I suppose it was at that time.

"Mr. Draper: We object to that. (Objection is overruled by the court, to which ruling of the court defendants except.)

"(5) I will ask you if it isn't a part of the reputation of both Arthur and Frank that they are moonshining and bootlegging?

"(Objected to by the defendants. Objection overruled by the court, to which ruling of the court defendants except.)

A. I have heard that since this come up.

"Mr. Draper: We object to that answer, and ask your honor to withdraw it from the jury.

"By the court: Gentlemen, that is withdrawn from you.

"(6) Isn't it a part of their reputation that they are both moonshiners and bootleggers?

"Mr. Draper: We object to that question. (Objection

Tucker v. State.

overruled by the court, to which ruling of the court defendants except.)

"A. Yes, it is talked in the country.

"Mr. Draper: We object to the answer as incompetent, and ask your honor to withdraw it from the jury. (Objection overruled by the court, to which ruling defendants except.)"

Again, in the cross-examination of Owen Hardin, another witness for the defendants, the following occurs:

"(14) You say up until this trouble their reputation was good? A. Good so far as I know.

"(15) Good so far as what people say—I will ask you if it isn't a part of the reputation of Frank Tucker that he has been selling whisky?

"Mr. Draper: We object to that as incompetent. (Objection is overruled by the court, to which ruling defendants except.)

"A. I have heard it talked since the killing happened.

"Mr. Draper: We object to the answer as incompetent.

"By the court: Let the exception be sustained. Listen to the question.

"(16) Isn't it a part of his reputation that he has been selling whisky?

"Mr. Draper: We object to that as incompetent. (Objection overruled by the court, to which ruling defendants except.)

"A. You want me to answer that?

"By the court: Say whether it is or not? A. I don't think it is that, I haven't heard about it.

"(17) You haven't heard he was selling whisky? A. No, sir.

"(18)    I understood you to say a while ago that he was.

"Mr. Draper: We object to that, and ask the court to withdraw it from the jury.

"(19)    Isn't it a part of his reputation that he is moonshining and bootlegging?

"(Objected to by the defendants. Objection overruled by the court, to which ruling of the court defendants except.)

"(20)    Answer the question. A. It has since the killing happened. .

"(21)    Isn't it a part of Arthur Tucker's reputation that he is moonshining and bootlegging whisky?

"Mr. Draper: We object to that.

"By the court: Answer the question. (Defendants except to the ruling of the court.) A. It has since the killing, I have heard some talk of it.

"(Objected to by defendants. Objection overruled by the court, to which ruling of the court defendants except.)"

On the cross-examination of another witness, George Walker, the following occurred:

"(5)    Isn't it a part of their reputation that they both are moonshining and bootlegging?

"(Objected to by the defendants as incompetent, objection overruled by the court, to which ruling defendants except.) A. I have heard it talked.

"(6)    Is it general talk in the community?

"Mr. Draper: I object to the last answer.

"By the court: You may ask if the majority of the people have talked it. A. I have heard one or two say they thought they was.

"Mr. Draper: We object to that as incompetent. (Objection sustained by the court.)"

The trial judge here seems to have had the idea that the number of people who circulated the report or rumor determined the competency or incompetency of the evidence.

This point of view is emphasized in the cross-examination of John Roberts, a character witness for the defendants, who, when asked about the reputation of the defendants for moonshining and bootlegging, answered:

"It is hearsay with me among some of the people.

"By the court: Reputation is made up of what people say about a person in the community, now do you know what the people say about them? A. Just a few people that says that.

"Mr. Draper: We object to that and ask your honor to withdraw that from the jury.

"By the court: You will have to say if that is their reputation—gentlemen of the jury, this statement that he heard a few people say, that is withdrawn from you."

It is however insisted in the strong brief filed on behalf of the State that the trial judge during the cross-examination of the witness Jim Moore (introduced by defendants) explained the distinction during the following colloquy:

"(9) Isn't it a part of their reputation that they both had stills, and have been engaged in the illicit manufacture of whisky. A. I don't know.

"(10) I say isn't that a part of their reputation? A. I don't know.

"(11) Well what the people say about it down there?

"By the court: Answer that. A. Well, I have heard some such talk as that.

"Mr. Draper: We object to all the question and all the answers because it is an effort on the part of the State to prejudice these defendants before the jury, and because this is all hearsay.

"By the court: The defendants offered this witness to show that the defendants bear a good reputation, and it is competent for the State to show on cross-examination that it was a part of their reputation that they were engaged in selling whisky, to test the credibility of the witness and his knowledge of defendants' reputation.

"Mr. Draper: We except to the statement of the court in the presence of the jury.

"By the court: I have got to rule on your exception."

The witness Moore was one of the first character witnesses (if not the first) offered by the defendants; and while the court, as above set forth, did in his ruling suggest the purpose for which this evidence was competent, yet this distinction is not again mentioned in the various colloquies between the court and counsel which followed, when other character witnesses were introduced, some of which have been already quoted in full.

As there seems to have been some confusion in the minds of the trial judge and of counsel on the questions of evidence arising, it may be well to consider the applicable principles of law.

(a) For what purpose may a character witness for defendant in a criminal trial be cross-examined?

While we have not been referred to any of our own cases discussing the specific point, it has often been made the subject of decision in other jurisdictions, and of discussion by text- writers.

Tucker v. State.

·In Ruling Case Law it is said:·

"Character or reputation can be proved only by evidence of general reputation in the community, and not by specific acts nor from the personal knowledge of the witness. A party to a suit should always be prepared to defend his general character or reputation, but not to answer to charges of particular acts, unless they are the subject of the action. Accordingly, evidence of defendant's good character by general reputation cannot be rebutted by evidence of particular acts of misconduct or crime, and that by rumors and reports in the country. But a witness as to character may on cross-examination be interrogated as to what he has heard in the community touching the character of the party inquired about. This is to afford a test of the value of his evidence in chief, to show that his conclusion as to the reputation in issue, and which rests upon the estimation of the community, is not supported by the expressions of that estimation, and thus to weaken its force."

See, also, 10 R. C. L., p. 953; 8 R. C. L., p. 211.

In Corpus Juris the rule is thus stated:

"A witness as to character may be asked on cross-examination as to the particular charges against or reports, concerning the person whose character is under investigation, which he has heard, or as to facts otherwise known to him, or as to what he has himself said at a particular time and place as to matters affecting the character of the person about whom inquiry is made, or what the reputation is in connection with certain specified transactions within the reasonable range of the direct examination. But the object of such inquiries is merely to

149 Tenn.—8.

Tucker v. State.

test the accuracy and candor of the witness, and the facts so elicited are not evidence as to the character or reputation of the person about whom the inquiry is made." 22 Corpus Juris, p. 483.

This question is discussed at length in the case of *Moulton* v. *State* (1889), 88 Ala., 116, 6 South., 758, 6 L. R. A. 301. It is there said, at page 302 of 88 Ala., (6 South., 759):

"So, too, rumors and reports which the witness has heard, respecting the man whose character he deposes to, naturally serve to form the general estimate, and to evidence it to the witness. Opinions, therefore, and rumors and reports, concerning the conduct or particular acts of the party under inquiry, are the source from which, in most instances, the witness derives whatever knowledge he may have on the subject of general reputation; and, as a test of his information, accuracy and credibility, but not for the purpose of proving particular acts or facts, he may always be asked on cross-examination as to the opinions he has heard expressed by members of the community, and even by himself as one of them, touching the character of the defendant or deceased, as the case may be, and whether he has not heard one or more persons of the neighborhood impute particular acts or the commission of particular crimes to the party under investigation, or reports and rumors to that effect."

In the above case the supreme court of Alabama reversed a conviction because a character witness for defendant was asked on cross-examination as to specific acts of the accused within his own knowledge.

There is, then, a sharp distinction between evidence of

Tucker v. State.

the general reputation of a defendant, and evidence of specific acts and conduct which may be developed on cross-examination.  The one class of evidence may shed light on the guilt or innocence, the credibility or lack of credibility, of the accused.  The other class of evidence must be limited to testing the value of the opinion of the character witness.

The objection interposed by defendants' counsel that this evidence was "hearsay" was hardly adequate—for specific acts of wrongdoing could not have been proved even by direct evidence.  But, if the State could not have proved such specific acts by witnesses having direct knowledge, for the purpose of attacking the characters of the defendants, then it was doubly erroneous to permit hearsay evidence for this purpose.

Nor is the rule changed by the use of the phrase "part of his general reputation." . There is no magic in these words.  The specific charge (for example) in the present case that Frank Tucker once assaulted his brother Luther with a knife cannot be made competent by asking whether this incident was "part of his general reputation."

We are therefore of opinion that the trial judge erred in failing to sharply make before the jury the distinction above pointed out, and in failing to tell the jury that the questions asked on cross-examination were merely for the purpose of testing the accuracy and credibility of the character witnesses, and that the evidence thus developed was not substantive evidence of good or bad character.

We are speaking in this connection of acts, rumors, or reports prior to the homicide.  Subsequent acts or reputation fall under another rule.

While, as before noted, the trial judge did make this distinction in the course of a colloquy between himself and defendants' counsel in the case of one of the first character witnesses introduced, yet his remarks seem to have been directed to counsel rather than to the jury, and the distinction was not thereafter observed.

(b)   The trial judge also failed to make a more important distinction viz. the distinction between the case of a defendant to a criminal action, whose character has been put in issue, and the case of a third person not a party to the litigation.

In the case of a defendant, interested persons may have put in circulation rumors derogatory to his character, for the very purpose of influencing the expected trial.

This difference is clearly pointed out by Prof. Wigmore, as follows:

"Where the desired character is that of a party—for example, the defendant in a criminal charge, the prosecutrix in a rape charge, or the plaintiff in a statutory action for seduction—it is obvious that after the charge has become a matter of public discussion, and partisan feeling on either side has had an opportunity to produce an effect, a false reputation is likely to be created—a reputation based perhaps in part upon rumors about the very act charged or upon the interested utterances of either party. The safeguards of trustworthiness are here lacking; accordingly it is generally agreed that a reputation at any time after a charge published, or other controversy begun, is not admissible. But, since the above reasoning is directed against the risk of an unduly hostile reputation, it would seem that a party might properly be allowed to

invoke in his favor a good reputation *post litem motam."* Wigmore on Evidence, vol. 2, section 1618.

The same distinction is pointed out in several of our own cases. Thus, in *Lea* v. *State* (1895), 94 Tenn., 495, at page 496, 29 S. W., 900, the court said:

"The defendant's character, whether good or bad, since the charge, cannot affect the question of his guilt or innocence of the crime imputed to him. His character since the charge may well go to his credibility as a witness in his own behalf, because existing at the time he testifies; but it does not reach or illustrate the question of his guilt or innocence."

In *Moore* v. *State* (1896), 96 Tenn., 209, 218, 33 S. W., 1046, 1048, the alleged error was the instruction of the trial judge limiting proof of defendant's character to a time previous to the encounter. The court held that, since the character witnesses introduced by the defendant testified as to his reputation for peace and good order, it was proper to limit his good character in that respect to the date of the homicide. It was then said *arguendo*:

"For, while evidence is admissible to show that the previous good character of the accused was such as to make it improbable that the accused would be guilty of the crime charged (*People* v. *Dogett*, 62 Cal., 27; *Kee* v. *State*, 28 Ark., 155; *Young* v. *Com.*, 6 Bush., 312), yet testimony that he has borne a good character subsequent to the commission of the offense is not competent (*Brown* v. *State*, 46 Ala., 175; *State* v. *Kinley*, 43 Iowa, 294)."

The subject received thoughtful consideration in the opinion of Chief Justice NEIL in *Powers* v. *State* (1906), 117 Tenn., 363, 97 S. W., 815. The defendant, Powers, had

fatally stabbed his school-teacher, who was trying to chastise him. One of the State's witnesses, on cross-examination, gave the defendant a good character. On re-examination, the witness was permitted to state, over exception, that since the homicide witness had "heard reports that the Powers boy had run his step-father away from home with a knife, and had threatened to kill another school-teacher, and had lain in wait for him with a shot-gun." On cross-examination of character witnesses introduced by the defendant the same matter was elicited. The evidence was objected to on the ground that the reports in question had not been heard until after the commission of the homicide for which defendant was being tried. The court said, at page 373 of 117 Tenn., (97 S. W., 817):

"This testimony while belonging to a class of evidence which would be competent in general as against the defendant's character for peace and quietness and good order, offered by him in aid of his defense to the charge contained in the indictment, yet was not competent in the present case, because the matter testified to came to the knowledge of the witnesses after the commission of the homicide which was the subject of investigation. The reputation which a defendant has made upon the subject of quietness and good citizenship available for or against him in a criminal cause when he puts his character in issue is that which he bore at and before the taking place of the act for which he is upon trial, not a reputation subsequently acquired or created for or against him. A different view would put a premium on the manufacturing of evidence. *Lea* v. *State,* 94 Tenn., 495, 497, 29 S. W., 900; *Moore* v. *State,* 96 Tenn., 209, 218, 33 S. W.,

1046; *State* v. *Johnson,* 60 N. C., 151, 152; 1 Elliott on Evidence, section 168, note 144."

The court then discusses at length the question whether the evidence was competent for the purpose of impeaching the defendant in his character or capacity as a witness for himself, and holds after a full discussion, that the evidence mentioned "was incompetent for the purpose of impeaching the defendant below as a witness in his own behalf," adding:

"It was also incompetent as evidence impeaching the character of the plaintiff in error as a witness, if it be treated as an effort to prove special instances of other crimes attempted or committed, because special matters cannot be proven against a witness by third persons, but such inquiry must be confined to matters of general reputation. *Zanone* v. *State,* 97 Tenn., 101, 115, 36 S. W., 711, 35 L. R. A., 556; *Ford* v. *Ford,* 7 Humph., 92, 100-102; *Merriman* v. *State,* 3 Lea, 394; *Gilliam* v. *State,* 1 Head, 39, 73 Am. Dec., 161; 2 Elliott on Evidence, section 978."

We are therefore of opinion that this evidence relating to wrongful acts or bad reputation of the defendants subsequent to the homicide was incompetent for any purpose. It could not be considered on the question of their guilt or innocence, nor could it shed light on their credibility as witnesses.

It is hardly necessary to add that the principle announced does not apply to the cross-examination of the defendants themselves as witnesses in their own behalf. *Powers* v. *State,* 117 Ten., 363, 379, 97 S. W., 815; *Zanone* v. *State,* 97 Tenn., 101, 36 S. W., 711, 35 L. R. A., 556.

In the present case, the State did not see fit to cross-examine the defendants on these matters.

(c) Another point on which the trial judge seemed somewhat confused was with regard to the number of people whom the witness may have heard discuss the conduct, or rumors relating to the conduct, of the defendants.

What his honor doubtless had in mind was the rule that a man's general reputation is to be established by what a majority of his neighbors and acquaintances—or those chiefly conversant with him—would say about him. The rule is generally so stated, and, as pointed out by Mr. Wigmore, the reputation "must involve the general opinion, not a partial or fragmentary one." "Nevertheless," as the learned writer continues, "that opinion may exist as a general one, entertained by the community as a whole, although no utterance by that general mass of its members, or even by a majority of them, has been made. In other words, a general reputation may by inference be believed to exist, although the utterances actually heard by the witness, and used as the basis of his inference, may be and usually are those of a representative minority only." Wigmore on Evidence, vol. 2, section 1613.

See, also on this point Pickens v. State, 61 Miss., 566, 567.

But this rule applies only in the case of general reputation, and can have no application where a character witness is asked on cross-examination concerning specific acts of wrongful conduct on the part of a defendant, or rumors or reports relating thereto. Such acts, reports, or rumors can only be made the subject of inquiry for the purpose of

Tucker v. State.

testing the accuracy, credibility, and sources of opinion of the character witness; and such inquiries, as already shown, must relate to a period prior to the commission of the alleged criminal act for which the defendant is on trial. In this aspect the State on cross-examination might ask what the witness had heard from one or more persons. The number would cut no figure. But such evidence should be·admitted only for the purpose, and with the qualification and explanation, already stated.

In the present case, however, where the alleged reputation was acquired or the specific acts committed after the homicide, the evidence was wholly incompetent, and should not have been admitted even for the purpose of reflecting on the credibility of the defendants as witnesses. *Powers* v. *State,* supra,

(d)    While the point does not arise on this record (and is therefore not decided), it may be noted that there seems to be doubt as to the admissibility for any purpose of questions relating to "moonshining."

In the very recent case of *Ex parte Marshall* (1922), 207 Ala., 566, 93 South., 471, 25 A. L. R. 338, the supreme court of Alabama held that it was reversible error to ask a defendant charged with violation of the prohibition laws whether he had not been previously convicted of making liquor—on the ground that the distillation of spirituous liquors was not an offense involving moral turpitude, and therefore did not affect the credibility of the witness.

Moral turpitude, says the court means "something immoral in itself, regardless of the fact that it is punished by law. It must not merely be *mala prohibita,* but the act itself must be inherently immoral."

2. With the evidence as to character in this condition, the court charged the jury on that subject as follows:

"The law presumes that the defendants are persons of good reputation, nothing to the contrary appearing, and in addition it was competent for them to offer evidence to show that they are persons of general good reputation in the community where they live, and for the State to offer evidence that they are persons of bad reputation. You should consider all the evidence both for and against their general reputation, and, if you find that the defendants bear a good general reputation in the community where they live, then you should consider their good reputation and character as witnesses in their behalf. The court also permitted evidence before you that the accused and also the deceased were generally reputed to be quiet, peaceable, and law-abiding men in the community where they live. This evidence should also be considered by you upon the question of who was probably the aggressor in the difficulty in which the deceased lost his life, and also upon the question whether or not the defendants acted in their own self-defense."

It will be observed that the trial judge in his charge failed to make the distinction already pointed out between the general character, or reputation, of the defendants before and after the homicide.

While, as is pointed out by the State, no request was made in this behalf, we think that it was incumbent on the court under the facts of this case to clear up the confusion which must have existed in the minds of the jury by a concise statement of the applicable rule.

A large portion of the damaging evidence adduced on

Tucker v. State.

cross-examination related to the character of the defendants since the homicide. To charge the jury generally under the facts of this particular case, and in view of the court's erroneous rulings, already mentioned that "you should consider all the evidence both for and against their general reputation," etc., was to leave an erroneous impression on the minds of the jury.

3. Did the mistakes of the trial judge which we have discussed constitute reversible error, in view of the provisions of chapter 32 of the Acts of 1911 (section 1), providing "that no verdict or judgment shall be set aside or new trial granted by any of the appellate courts of this State, in any civil or criminal cause, on the ground of error in the charge of the judge to the jury, or on account of the improper admission or rejection of evidence, . . . unless, in the opinion of the appellate court to which application is made, after an examination of the entire record in the cause, it shall affirmatively appear that the error complained of has effected the results of the trial?"

In *Railroad* v. *Morgan* (1915), 132 Tenn., 1, 20, 175 S. W., 1148, 1153, this court said, with respect to a charge, erroneous in that the court improperly told the jury that, if a witness was shown to have sworn falsely and corruptly in one material respect, his testimony must be rejected altogether, etc.:

"We do not think that chapter 32 of the Acts of 1911 would apply to such deprivation of constitutional right."

In *Frank* v. *Wright* (1917), 140 Tenn., 535, 546-548, 205 S. W., 434, the case was reversed for the admission of improper evidence, in that a witness was permitted to say that defendant's chauffeur told her he was using the

automobile on his master's business—and this action was taken in spite of the contention that the Act of 1911 should preclude a reversal.

These cases, as will be noted, were civil cases, and more doubt existed as to the prejudicial nature of the court's act than can exist in the present case.

The record here tends to show much partisanship and a rather inflamed state of public opinion. The parties involved are prominent. The defendants are young men, Arthur Tucker being about twenty-one, and his brother Frank about twenty-five. The latter was a soldier, with a good record, in the World War. The deceased left a widow and five children. A civil suit for a large amount has been brought by the administrator of the deceased, Hughey, against the Tuckers, and counsel in that case are assisting the prosecution. Another legal controversy is pending in the chancery court over the possession of the tract of land conveyed by the father of plaintiffs in error to the deceased Hughey.

Under these conditions it is easy to see how prejudicial rumors might be put afloat by partisans of one side or the other. It is, in fact, insisted in the present case that the whisky charges against the defendants are sleeveless, and have been instigated for the purpose of affecting the controversies, civil and criminal, already mentioned. We, of course, express no opinion as to this; nor do we express any opinion on the assignment (earnestly pressed) that the evidence preponderates against the verdict.

As previously indicated, however, the case appears to present a number of sharply contested issues of fact, and

Tucker v. State.

as to the most material issues the defendants must rely on their own testimony.

Under such circumstances, the action of the court in permitting evidence to go to the jury concerning alleged violations of the liquor laws by the defendants since the date of the homicide, and in failing to qualify and limit the evidence of acts or reports preceding the homicide, must have had a most prejudicial effect on the minds of the jury.

We fully appreciate the difficulties under which the trial judge labors in a case of this sort. He must rule one way or the other on perplexing questions as they arise, without the opportunity to consult authorities. It is apparent from the record (all of which we have carefully read) that the judge who presided below made a conscientious effort to give the defendants a fair trial. But the errors which we have pointed out were in our opinion so highly prejudicial that without passing on other assignments we are constrained to reverse the case and remand it for a new trial.