STATE OF HAWAII
*v.* ROBERT RITCHIE JOHNSTON, JR.

No. 4711.

STATE OF HAWAII *v.* RALPH EUGENE FULLER.

No. 4714.

MAY 26, 1969.

RICHARDSON, C.J., MARUMOTO, ABE, LEVINSON, JJ., AND
CIRCUIT JUDGE FUKUSHIMA ASSIGNED
BY REASON OF VACANCY.

OPINION OF THE COURT BY ABE, J.

Defendants in the two cases were charged with the crime of lewdness for having masturbated in public restrooms in violation of HRS § 768-52(2).

In No. 4714, defendant Fuller was first tried in the District Court of Honolulu and was found guilty and sentenced to pay a fine of $25.00. Defendant perfected an appeal to the Circuit Court of the First Circuit demanding a trial by jury.

In both cases at the trials, before the jury was impaneled, defendants challenged the jury array on the ground that the three-year residential requirement for a citizen of

the State to serve on the jury was unconstitutional. This motion was denied by the court without argument.

The jury was impaneled and after the trials, in both cases, the jury returned verdicts of guilty and judgments were entered accordingly. Defendants appealed.

## I.

The first specification of error in No. 4714 is that § 768-52(2) as interpreted and enforced in that case makes the statute void for vagueness. Defendant is not attacking the constitutionality of the statute but his contention is that because the detectives who testified for the State did not give the same testimony in the district court and the circuit court, the offense of lewdness depends upon the "opinion" of the arresting officers which may change from "moment to moment" and therefore the law as enforced in this case is unconstitutional.

In essence, defendant by his first specification of error is questioning the credibility of the witnesses or the weight of evidence. This court has held in numerous cases that the jury is the sole judge of the credibility of the witnesses or the weight of evidence. *State* v. *Kekaualua,* 50 Haw. 130, 433 P.2d 131 (1967); *State* v. *Carvelo,* 45 Haw. 16, 361 P.2d 45 (1961).

We also stated in *State* v. *Kekaualua, supra,* at 132: "[w]hen a jury verdict involves conflicting evidence and depends on the determination of credibility of witnesses or the weight of evidence, the test on appeal is whether there is substantial evidence to support the verdict of the jury." *See also, Territory* v. *Ebarra,* 39 Haw. 488, 492 (1952); *Territory* v. *Gagarin,* 36 Haw. 1, 5 (1941).

The record shows that there was substantial evidence to support a guilty verdict against defendant.

Therefore, we find no merit in the first specification of error.

## II.

In both cases the basic issue is the constitutionality of the three-year residential qualification for jurors of this State.

This issue raises a very serious and interesting question and for its determination we believe a brief review of the history of trial by jury may be helpful.

"The theory of the early trial by jury, as of the earlier recognition from which it sprung, was that the jurors were required to come from the vicinage or neighborhood and declare their vere dictum on their oaths and of their knowledge * * *.

"By the time of Henry VI (1422-1461) the separation of jurors and witnesses is complete, but the idea that jurors must come from the neighborhood and not be wholly strangers to the fact, and that they could disregard the sworn testimony of witnesses in arriving at their verdict, persisted in England as late as 1816."[1]

"It nevertheless appears that the functions of the ancient and modern juries are distinct, in that the former, in most instances, were merely compurgators, deciding on their own knowledge while the latter are judges of facts, deciding evidence; yet the two are connected by the tribunal of mixed function, which decided on its own knowledge, assisted by the testimony of witnesses; and from all of these came the jury, as now existing, which decides exclusively on the evidence presented before him. Just when and precisely how these changes came to pass, as beforesaid, are points which none of the students of the subject seem able to tell us much about."[2]

---

[1] I, Busch, *Law and Tactics in Jury Trial*, 10 (1879).

[2] R. von Moschzisker, *The Historic Origin of Trial by Jury*, 70 U. Pa. L. Rev. 170 (1921).

It is to be noted that provisions in both the United States Constitution and the Constitution of the State of Hawaii require that in all criminal prosecution the accused shall be tried by an impartial jury of the state and district wherein the crime was committed.[3]

The reason given for the rule requiring a jury to be from the vicinage or district, and which unquestionably weighed in its development, is that the accused shall have the benefit on his trial of his own good character and standing with his neighbors if he had preserved them and also of such knowledge as the jury may possess of the witnesses who may give evidence against him. *State* v. *Bunker,* 38 Kan. 741, 17 P. 651 (1888). Another reason sometimes given is that the provision insures a person charged with a crime from being transported to a distant site for trial, where he cannot have the benefit of the presence of his witnesses and of having their statements weighed by jurors who are generally acquainted with them. *Oborn* v. *State,* 143 Wis. 249, 126 N.W. 737 (1910); *Zanone* v. *State,* 97 Tenn. 101, 36 S.W. 711 (1896); *State* v. *O'Brien,* 35 Mont. 482, 90 P. 514 (1907).

It is general law that when a defendant is tried by a jury impaneled in a county or jurisdiction other than the county or jurisdiction wherein the crime was committed, his constitutional right to be tried by an impartial jury of the district or jurisdiction wherein the crime was committed is violated. *Althoff* v. *Indiana,* 209 Ind. 42, 197 N.E. 896 (1935); *Commonwealth* v. *Jones,* 118 Ky. 889, 82 S.W. 643 (1904).

This being the law, a criterion must be set to meet this constitutional requirement, and the State legislature is the proper body to determine such criterion.

In discharge of its function, the Hawaiian legislature

---

[3] See Article VI (Amendment) U.S. Constitution and Article I, Section 11, Constitution of the State of Hawaii.

enacted HRS § 609-1 which provides as one of the qualifications of a juror that he must have resided in the State of Hawaii for not less than three years.[4]

It is of interest to note that the Congress of the United States discharged the function with regard to jurors in federal courts. In 1957 by Pub. L. 85-315, it amended the statute on qualifications of federal jurors by providing that to qualify as a juror one must have "resided for a period of one year within the judicial district"[5] in place of the former requirement that one must have "resided within the judicial district."

## A. PRIVILEGES AND IMMUNITIES CLAUSE

One of defendants' contention is that the three-year residential qualification for jurors violates the privileges and immunities clause of the Fourteenth Amendment.

The Fourteenth Amendment, Section 1, provides:

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States * * *."

In *Presser* v. *Illinois,* 116 U.S. 252 (1886), at page 266

---

[4] HRS § 609-1 reads:

"§ 609-1. *Qualifications.* A person is qualified to act as a juror or grand juror:

(1) If he is a citizen of the United States, and of the State, of the age of twenty years or over; possesses the qualifications for registration as a voter; has resided in the State for not less than three years; is a resident of the circuit from which he is selected; and

(2) If he is in possession of his natural faculties and not decrepit; and

(3) If he is intelligent, and of good character; and

(4) If he can understandably speak, read and write the English language; and

(5) If he is selected, summoned, returned and sworn without reference to race, or place of nativity."

[5] 28 U.S.C., ch. 121, § 1861.

the court, in interpreting the privileges and immunities clause of the Fourteenth Amendment, stated:

"It is only the privileges and immunities of citizens of the United States that the clause relied on was intended to protect. A State may pass laws to regulate the privileges and immunities of its own citizens, provided that in so doing it does not abridge their privileges and immunities as citizens of the United States."

The Supreme Court of Utah in *Steed* v. *Harvey,* 18 Utah 367, 54 P. 1011 (1898), at page 1012 said:

"There are privileges, however, which states give only to their own citizens,—rights which they will not permit citizens of other states to acquire and possess, —such as the election franchise, the *right to sit upon juries,* and the right to hold public office. These rights they make dependent on citizenship. If a sovereignty were to intrust the elective franchise to the citizens of another state only in part, it would not rest upon the will of its own citizens; or if a state were to permit its offices to be filled, and their functions to be exercised, by citizens of other states, its citizens, to that extent, would not enjoy the right of self-government. Such rights and privileges are not contemplated by the words 'privileges and immunities,' used in the constitutional provisions above quoted. * * *" (Emphasis added.)

The privilege to serve as a juror in the courts of Hawaii belongs to one as a citizen of the State of Hawaii and not as a citizen of the United States. *Steed* v. *Harvey,* 18 Utah 367, 54 P. 1011 (1898); *State* v. *Hall,* 187 So.2d 861 (Miss. 1966). Thus, the statute does not violate the privileges and immunities clause.

## B. EQUAL PROTECTION AND DUE PROCESS CLAUSES

Defendants also contend that the three-year residen-

tial qualifications for jurors violates the equal protection and due process clauses of the Constitutions of the United States and the State of Hawaii.

The general principle stated by the courts in the interpretation of the equal protection clause is that all persons shall be treated alike under like circumstances and conditions, both in the privileges conferred and in the liabilities imposed. *Commonwealth* v. *Life Assurance Co. of Pa.,* 419 Pa. 370, 214 A.2d 209 (1965); *Morey* v. *Doud,* 354 U.S. 457 (1957); *Hartford Steam Boiler Inspection and Insurance Co.* v. *Harrison,* 301 U.S. 459 (1937).

The United States Supreme Court in *Stebbins* v. *Riley,* 268 U.S. 137 (1925), at page 142 said:

"The guarantee of the Fourteenth Amendment of the equal protection of the laws is not a guarantee of equality of operation or application of state legislation upon all citizens of a state. As was said in *Magoun* v. *Illinois Trust and Savings Bank* [170 U.S. 283] at page 293:

'It only prescribes that that law have the attribute of equality of operation, and equality of operation does not mean indiscriminate operation on persons merely as such, but on persons according to their relations. In some circumstances it may not tax A more than B, but if A be of a different trade or profession than B, it may. * * * In other words, the State may distinguish, select and classify objects of legislation, and necessarily this power must have a wide range of discretion.' "

Also in *New York Rapid Transit Corp.* v. *City of New York,* 303 U.S. 573 (1938), at page 578 the Court said:

"*I. Classification.* No question is or could be made by the Corporation as to the right of a state, or a municipality with properly delegated powers, to enact laws or ordinances, based on reasonable classification of the

objects of the legislation or of the persons whom it affects. 'Equal protection' does not prohibit this. Although the wide discretion as to classification retained by a legislature, often results in narrow distinctions, these distinctions, if reasonably related to the object of the legislation, are sufficient to justify the classification. * * * Indeed, it has long been the law under the 14th Amendment that 'a distinction in legislation is not arbitrary, if any state of facts reasonably can be conceived that would sustain it, . . .' * * * 'The rule of equality permits many practical inequalities.' * * * 'What satisfied this equality has not been and probably never can be precisely defined.' * * *"

Thus, what is prohibited by the equal protection guaranty is class legislation, discriminating against some and favoring others. The guaranty was not intended to take from the states the right and power to classify the subjects of legislation, provided such classification of persons and things is reasonable for the purpose of legislation.

The United States Supreme Court has held in numerous cases that intentional exclusion of persons from a jury list solely because of their racial or ethnic background is denial of the equal protection guaranty. *Swain* v. *Alabama,* 380 U.S. 202 (1965); *Hernandez* v. *Texas,* 347 U.S. 475 (1954). If the statute in question purported to exclude persons from the jury because of racial or ethnic background, we would without any hesitation hold such statute to be unconstitutional.

Defendants argue that the statute is unconstitutional and void, without submitting any evidence, or even offering to present evidence to prove that the three-year residential qualification is unreasonable. They have called our attention to two other statutes prescribing similar requirements, one for governmental employees[6] and the

---

[6] HRS § 78-1.

other for employees of public utilities,[7] and argue that these statutes set up two different classes of people—"malihini," newcomer, and "kamaaina," oldtimer. They argue that the statute on jurors subjects a "malihini" to be tried by a jury composed only of "kamaainas" and defendants are thereby denied equal protection guaranty and due process of law. However, no evidence was introduced nor offer of proof made by defendants to show existence of discrimination or prejudice against "malihinis."

In *Hernandez* v. *Texas,* 347 U.S. 475 (1954), the United States Supreme Court said at page 478:

"Throughout our history differences in race and color have defined easily identifiable groups which have at times required the aid of the courts in securing equal treatment under the laws. But community prejudices are not static, and from time to time other differences from the community norm may define other groups which need the same protection. Whether such a group exists within a community is a question of fact. When the existence of a distinct class is demonstrated, and it is further shown that the laws, as written or as applied, single out that class for different treatment not based on some reasonable classification, the guarantees of the Constitution have been violated. * * *"

In *Commonwealth* v. *Slaney,* 350 Mass. 400, 215 N.E.2d 177 (1966), defendant was 25 years of age when he was indicted and he contended that a statute excluding qualified voters between the ages of 21 and 25 years to be unconstitutional discrimination and a denial of equal protection of the laws. The Court in upholding the constitutionality of the statute said at page 179:

"It is not enough merely to aver unconstitutional discrimination. When challenging the composition of

[7] HRS § 70-1.

a jury, the defendant has the burden of proving (Akins v. State of Texas, 325 U.S. 398, 400, 65 S. Ct. 1276, 89 L. Ed. 1692) that the absence of a certain class from a jury list resulted from an 'arbitrary and systematic' policy of exclusion, Hoyt v. State of Florida, 368 U.S. 57, 59, 82 S. Ct. 159, 7 L. Ed.2d 118, directed against an 'identifiable group in the community which may be the subject of prejudice.' Swain v. State of Alabama, 380 U.S. 202, 205, 85 S. Ct. 824, 827, 13 L. Ed.2d 759.

"Slaney failed to meet the standards of proof required. His counsel's affidavit was again the only support offered to prove an exclusion. He asserted but did not prove the absence of persons under twenty-five. Conceding, arguendo, the truth of the assertion, we do not think that the allegedly excluded class is the kind contemplated by the *Swain* and other cases which involved racial or political bases of discrimination. Further, even assuming that persons under twenty-five indeed constitute such a group, the record fails to demonstrate that their exclusion resulted from a systematic policy rooted in prejudice." *See also Britton* v. *Bullen,* 275 F. Supp. 756 (D.C. Md. 1967), upholding a similar Maryland statute.

Defendants in the two cases not only failed to prove but also failed to make any offer of proof that exclusion from the jury list of qualified voters who had resided in Hawaii for a period of less than three years is an invidious discrimination.

We believe that the statement of the United States Supreme Court in *Allied Stores of Ohio* v. *Bowers,* 358 U.S. 522 (1959) at page 528 is very appropriate:

"[I]t has long been settled that a classification though discriminatory, is not arbitrary nor violative of the Equal Protection Clause of the Fourteenth Amendment if any state of facts reasonably can be conceived

that would sustain it. *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U.S. 61, 78; *Quon Wing* v. *Kirkendall,* 223 U.S. 59; *Rast* v. *Van Deman & Lewis Co.,* 240 U.S. 342, 357; *State Board of Tax Comm'rs* v. *Jackson,* 283 U.S. at 537."

In reporting on the bill to enact the three-year residential requirement for jurors, the Judiciary Committee of the House of Representatives said in its report: "the fact that it requires more than one year to understand the customs and ways of our people here and to get an insight to their living conditions, your Committee feels that the three year requirement is a good one."[8] Nothing in the report suggests that the legislature was motivated by racial or ethnic consideration in enacting the bill into law. On the contrary, the report indicates that the motive was reasonable and legitimate, to assure fair jury trial to citizens and residents of this State. The legislature decided and it is not for us to question the appropriateness or soundness of the residential requirement, nor to question its wisdom in enacting the statute. *Railway Express Agency, Inc.* v. *New York,* 336 U.S. 106 (1949); *Olsen* v. *Nebraska,* 313 U.S. 236 (1941).

The general law is that one who assails the constitutionality of a classification has the burden of proving that it does not rest upon reasonable basis and that it is an invidious discrimination because laws are presumed to be constitutional, and all doubts on this point are resolved in favor of and not against it. *Hernandez* v. *Texas,* 347 U.S. 475 (1954); *Corporation Commission* v. *Lowe,* 281 U.S. 431 (1930); *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U.S. 61 (1911).

In *State* v. *Diamond Motors, Inc.,* 50 Haw. 33, 429 P.2d 825 (1967) at page 38, we said:

"The burden is upon the appellants to show that the

---

[8] 1945 House Journal, 645.

limitations and classifications are unreasonable. *State v. Safeway Stores, Inc.*, 106 Mont. 182, 76 P.2d 81. The record does not so show. * * * It was incumbent on them in invoking the protection of the Fourteenth Amendment 'to show with convincing clarity' that the ordinance created against them the discrimination of which they complain. *Corporation Comm'n v. Lowe*, 281 U.S. 431, 74 L. Ed. 945, 50 S. Ct. 397. They have not done so."

The defendants, it seems, are contending that they have met this burden by merely averring that the statute is unconstitutional because the statute does not treat all the citizens or residents of Hawaii equally. We recognize that the statute does not apply equally upon all of our citizens; however, this fact alone does not prove that the three-year residential qualification is an invidious discrimination and therefore unconstitutional.

Under the records of the cases, we hold that defendants have failed to prove that the three-year residential qualification is an invidious discrimination or even that it is an unreasonable classification. Thus, we hold that the statute is constitutional and that defendants were tried by legally constituted impartial juries within the meaning of the provisions of Article VI (Amendment), United States Constitution and Article I, Section 11, Hawaii State Constitution. We have no doubt that a trial by an impartial jury so constituted fulfills the due process requirement.[9] *Rapid Transit Corp. v. New York*, 303 U.S. 573, 587 (1938).

[9] It appears that the basis of the dissenting opinion is that the "impartial jury" requirement of the Sixth Amendment directs that the jury represent a cross-section of the community and the statute is unconstitutional because the three-year residential qualification precludes citizens who do not meet this requirement from jury service.

It justifies the disqualification of citizens between the ages of 21 and 25 years on the ground that such exclusion does not impair representativeness. Also, exclusions based on occupational classes, e.g., lawyers, doctors and ministers, are justified as being based "on the bona-fide

208

The judgments are affirmed.

*Joseph A. Ryan* (*Ryan* and *Ryan* of counsel) for defendants-appellants.

*Dennis A. Ing,* Deputy Prosecuting Attorney, City and County of Honolulu (*John H. Peters,* Prosecuting Attorney, with him on the briefs), for plaintiff-appellee.

### DISSENTING OPINION OF LEVINSON, J.

I dissent.

These challenges to the residence requirement for jurors are the first in this State and, insofar as I am aware, the entire country. Although counsel for the defendants-appellants has contributed little, if anything, to placing this case in the proper perspective, I believe it is imperative to present the issues as clearly as possible.

At the outset, I must point out that, for the most part, I am in agreement with the principles of law enunciated by my brothers with respect to the Privileges and Immunities Clause. However, in my opinion, the discussion relating to that constitutional issue is irrelevant to this case. The defendants are not contending that they as members of the excluded class, are being denied the right to serve on a jury. To the contrary, they are claiming that they are prejudiced because other people are being precluded from service on Hawaii's juries.

The crux of these cases, as I view them, is the defendants' claim that they are being deprived of their liberty without due process of law because of the alleged fact that

---

ground that it is for the good of the community that their work not be interrupted."

Where classes of citizens are excluded from jury service, whether it be on grounds of residence, age, occupation, illiteracy, etc., it would mean that the excluded classes of citizens will not be represented on the jury. Thus, to that extent, the jury will not represent a cross-section of a community. However, the issue is not whether a certain class of citizen is disqualified, but whether the classification which brings this result is reasonable.

they were not tried by an impartial jury as required by the Sixth Amendment of the United States Constitution. In my view, the majority omitted from its discussion the crucial question whether our state laws comply with the Constitutional mandate that a state provide an impartial jury in criminal cases. I confine my attention to this issue.

The statute upon which we are called to focus is HRS § 609-1 which provides among other things that "A person is qualified to act as a juror or grand juror: (1) If he is a citizen of the United States, and ... has resided in the State for not less than three years ...." The exclusionary effect of this requirement appears obvious. It precludes entirely the possibility that any person among the group which has lived in Hawaii less than three years will be summoned for prospective jury duty. In my judgment, the requirement is unconstitutional.

## I.

The present-day requirements for jurors mirror a philosophy and approach different from those existing in the days of the Hawaiian Kingdom and the Republic. For example, in the *Translation of the Constitution and Laws of the Hawaiian Islands* (1842), ch. XLVII, a Law for the Regulation of Courts, § 22 provided:

> If the accuser and the accused be both foreigners, then the jury shall be made up of foreigners only.
>
> If there be no foreigner on either side, then there shall be no foreigner on the jury.
>
> If there be a foreigner on one side and a native on the other then in forming the jury, half shall be foreigners and half Natives.

Later, the *Civil Code of the Hawaiian Islands 1859,* § 1197 provided:

> All native Hawaiians accused of any crime, shall be tried by a jury composed entirely of natives; and all

naturalized foreigners, by a jury composed entirely of foreigners, who shall be drawn from the array of native and foreign jurors, respectively, returned to serve at the term.

This provision, except for the deletion of the word "naturalized," was carried forward as section 1332 of the *Civil Laws of the Hawaiian Islands 1897.* "Foreigners" were defined by section 1326 of those laws as "foreigners by birth, or of foreign parentage."

These distinctions were eliminated by section 83 of the Organic Act for the Territory of Hawaii,[1] which contained the following:

The provisions of said laws or any law of the Republic of Hawaii which require juries to be composed of aliens or foreigners only, or to be constituted by impaneling natives of Hawaii only, in civil and criminal cases specified in said laws, are repealed, and all juries shall hereafter be constituted without reference to the race or place of nativity of the jurors; but no person who is not a male citizen of the United States ... shall be a qualified juror or grand juror in the Territory of Hawaii.

In 1903 a one-year residence prerequisite was imposed for jury duty.[2] From then until 1945, juries presumably were drawn from all varieties of people qualifying under the statute found in the community at large.

In 1945, the three-year residence requirement was enacted into law.[3] The legislative intent is shown in the 1945 House Journal at page 645:

This bill would require a three years' residence instead

---

[1] Act of April 30, 1900, ch. 339, 31 Stat. 141.

[2] This requirement was made indirectly. SESS. LAWS OF HAWAII, 1903, Act 38, § 1 provides that a juror must possess the qualifications of a voter. The Organic Act, Note 1, *supra,* § 60 required a one-year residency to vote.

[3] SESS. LAWS OF HAWAII, 1945, Act 163.

of one year to serve as a juror in the Territory of Hawaii. In view of the fact that it requires more than one year to understand the customs and ways of our people here and to get an insight into their living conditions, your Committee feels that the three year requirement is a good one.

This legislation was obviously designed to separate those Hawaii citizens with relatively short periods of residence from those with longer periods and to exclude the former group from serving, solely on the basis of those differing periods of residence. It came in a decade (1935 to 1945) when a much larger plan of exclusion for recently-arrived residents evolved. Such constitutionally questionable laws[4] as those barring a citizen who has lived in Hawaii less than three years from employment with a public utility[5] or the State itself[6] were enacted. Unsuccessful attempts were made to impose the three-year residence requirement upon persons wishing to practice law[7], medicine[8], and dentistry[9]. As to those professions, the Legislature was content to continue the then existing one-

---

[4] I believe the reasoning found in the recent Supreme Court case of Shapiro v. Thompson, 37 U.S.L.W. 4333 (U.S. April 2, 1969) where the Court struck down the residence requirements for welfare applicants may be equally applicable to Hawaii's residence requirements relating to employment or the practice of a profession or trade.

[5] Present applicable section is HRS § 270-1. The 1969 Legislature passed a bill (S.B. 316) which would reduce this residence requirement to one year. This bill is now awaiting the Governor's signature.

[6] Present applicable section is HRS § 78-1(a). The purpose of the original bill (SESS. LAWS OF HAWAII, 1935, Act 211) was to "assure better opportunity for local persons to serve public offices or positions." *Senate Journal* 1935 at p. 228.

An exception is found in the 1968 amendment to article IV, section 6 of the Hawaii Constitution which reduced from three years to one year the residence requirement for executive officers appointed by the Governor under that section.

[7] Senate Bill 132, 1937 Legislature. See report of the Committee on the Judiciary, *Senate Journal* 1937, p. 804.

[8] House Bill 403, 1945 Legislature.

[9] House Bill 368, 1945 Legislature.

year residence requirement since that was apparently deemed to be a "sufficient barrier."[10]

## II.

Whatever validity there was in 1945 (and I do not believe there was any) to the contention that it took former mainland residents three years to "understand the customs and ways of our people here and to get an insight into their living conditions,"[11] it is patently clear that such is not the situation today.[12] The record of Hawaii's struggle for statehood is filled with material which is contrary to the conclusions reached by the Legislature when the three-year residence requirement for jurors was enacted and which demonstrates that the requirement is arbitrary and unreasonable, contrary to the conclusions reached by my brethren on this court.

---

[10] See, for example, the report of the Committee on Public Health, Police and Military on the proposal to increase residence requirement for physicians. *House Journal* 1945 at p. 662:

From the standpoint of health and welfare of the territory, your Committee feels that to increase the residential qualifications from one year to three years is not only unwise but dangerous as it will practically close the door to highly trained and qualified men in the field of medicine to practice in the Territory.

Your Committee further feels that the present one year residential requirement constitutes a sufficient barrier and therefore returns House Bill 403 with the recommendation that the same be placed on file.

Sections presently in force are HRS § 605-1 in conjunction with § 11-4 (attorneys at law), § 453-4(2) (physicians and surgeons), § 448-9 (dentists).

One year's residence is also required as a prerequisite for examination as a certified public accountant, HRS § 466-8(2); chiropractor, § 442-2(2); notary public, § 456-2; optometrist, § 459-7; pharmacist, § 461-5; veterinarian, § 471-8(1). Two years' residence is required for application for a real estate salesman's license, § 467-8(5).

There is a five-year residence requirement for a person wishing to obtain a scholarship from the Board of Regents to attend the University of Hawaii (HRS § 304-15).

[11] *House Journal* 1945 at p. 645.

[12] It appears that the 1969 Hawaii Legislature agrees with me. A bill (H.B. 199) which would reduce the residence requirement for jurors to one year has been passed and sent to the Governor for his approval.

One source of such material is the record of the Hawaii Statehood Commission, which was created by the Legislature in 1947 and was supported by public funds. As an arm of the Legislature, it spoke not only for the Legislature, but presumably also for the voters who elected the representatives.

In a booklet published in 1959 just prior to the passage of the Statehood bill, the Commission with pride noted:

Hawaii is also a modern American community.

It has a streamlined government, a high standard of living, progressive industries, first-rate schools, familiar churches, and up-to-date transportation and communications facilities.

Its citizens live in modern houses, drive new automobiles (some with help of the finance company), belong to Republican and Democratic clubs, and send their children to the University of Hawaii or a favorite mainland college.

Hawaii residents yell themselves hoarse at football games, eat hot dogs, attend church services, watch television. They enjoy Broadway hit plays at the Honolulu Community Theatre and they take in "thriller" movies at drive-ins; they go to afternoon jazz sessions and attend evening Honolulu Symphony Orchestra concerts; they enjoy exhibits at the Honolulu Academy of Arts and read the funny papers.

\* \* \* \* \* \* \* \*

They're Americans, through and through.[13]

Not only did the Hawaii Statehood Commission conclude that the way of life in Hawaii was typical of that anywhere else in America, but also a special subcommittee of the United States House of Representatives reached a similar conclusion:

[13] *Statehood for Hawaii—The Case of a Half Million Americans at the Threshold* . . . (1959).

On the basis of comprehensive and exhaustive study, including numerous interviews with a complete cross-section of the population of the Hawaiian Islands, your subcommittee believes that Hawaii is entitled to statehood by every fair test and precedent.

This area of our Nation, last incorporated Territory under the American flag, has been in training for statehood for 60 years. In 1898 it became a firm and irrevocable part of the United States. *Its people are our people. Its philosophy is our philosophy. Its loyalty, like its language and currency, is identical to ours. Its servicemen are our servicemen, and its flag is our flag. Except for the full flowering of the voting franchise these people are us.*[14] (Emphasis added.)

Also, Secretary of Interior Fred Seaton wrote to the chairman of the House Committee on Interior and Insular Affairs as follows:

Hawaii is truly American in every aspect of its life. Its people have been citizens of the United States since 1900 [and] they have no other loyalty. They have lived under the same laws, paid the same taxes, and enjoyed the same constitutional guarantees as other Americans for over half a century. The Americanism of the people of Hawaii goes beyond mere legal conformity. Hawaii is pervaded by American ideals and practices in its civic organizations and private charities, in its educational system and its athletics, in its press and radio, and in its way of life generally.[15]

In testifying before the Senate Committee on Interior

---

[14] *Special Subcommittee of the House Comm. on Interior and Insular Affairs, Hawaii Statehood,* Comm. Print No. 39, 85th Cong., 2d Sess. at 1 (1959).

[15] *Hearings Before the House Comm. on Interior and Insular Affairs on H.R. 50 and H.R. 888,* 86th Cong., 1st Sess. at 16 (1959) (letter written by Secy of Interior Seaton).

and Insular Affairs, Frank Fasi (now Mayor of Hono-
lulu) testified:

> There was a statement made by a Senator of this com-
> mittee that the people of Hawaii have a language, a
> culture and a background that is different from the
> people on the Mainland. I disagree wholeheartedly
> with that statement.[16]

Delegate Joseph Farrington testified that Hawaii had be-
come "Americanized" by 1900:

> In 1900 Hawaii was given the political status of an
> incorporated Territory, and its new constitution, the
> Hawaii Organic Act, was approved by Congress.
>
> *By the time this came about, Hawaii's whole polit-
> ical, educational and community fabric had become
> predominantly American.* Hawaii came into the Union
> trained in democracy and completely imbued with the
> ideals of the Nation of which it is now an integral
> part.[17] (Emphasis added.)

I am unwilling to believe that all of the statements
made on behalf of securing statehood for our islands were
merely a form of "puffing" in an exuberant pitch to Con-
gress—or, even worse, an intentional misrepresentation of
what those making the statements believed to be the true
essence of our island life and culture. Indeed anyone who
has lived on the Mainland and here knows that the simi-
larities in life style are overwhelming.[18] If this were not
true, would Mainland states be justified in excluding new
residents from Hawaii from serving on their juries for a
period of three years? In my opinion, life in Hawaii is

[16] *Hearings Before the Senate Comm. on Interior and Insular Affairs on S. 49, S. 51, and H.R. 3575,* 83rd Cong., 1st Sess. at 182 (1953).

[17] *Hearings Before the House Subcomm. on Territorial and Insular Affairs on H.R. 21, H.R. 49, H.R. 205, H.R. 1745, and H.R. 2891,* 83rd Cong, 1st Sess. at 65 (1953).

[18] *See What It's Like in Hawaii,* CONG. REC. at A2992 (Daily ed. Apr. 5, 1960) (extension of remarks by Senator Oren E. Long).

more similar to life in most parts of the Mainland than is the daily life of Harlem similar to life in other parts of New York City.

Admittedly, Hawaii differs from her sister states with respect to the large racial differences between her citizens. But these differences do not, in any large measure, result in such an unusual life and culture as to require a newcomer three years to understand. These racial divergencies add something of importance to the strength and vitality of our modern American island society rather than change its character. As our Governor John Burns once said,

> In their daily lives, in everything they do, Hawaii's people are thoroughly American. More than this, they are American in an entirely unique way ... People of the most diverse racial strains and cultural backgrounds and of all creeds live together harmoniously and fruitfully, and in a way that brings out the best in each of these strains and backgrounds and creeds, and so increases and enriches the well-being of all others.[19]

### III.

It would be helpful, perhaps, to explore the facts readily available in public records to see the characteristics of those being excluded.

New residents are arriving in Hawaii at a rapidly increasing pace. Such residents coming from the mainland United States increased from 14,075 in fiscal 1961 to 37,495 in fiscal 1968. About 95,000 persons (including 50,000 military personnel and dependents) have moved to Hawaii during the past three years. This means that approxi-

---

[19] *Hearings Before the Senate Comm. on Interior and Insular Affairs on S. 50 and S. 36*, 85th Cong., 1st Sess. at pp. 9-10 (1957) (testimony by then Delegate John A. Burns).

mately 12.2 percent of the population is automatically excluded from jury service currently.[20]

One out of nine household heads on Oahu had lived in the State less than a year according to a survey made in 1966. This ratio has changed little since the first such survey, conducted in January, 1958.[21]

The residence requirement appears to exclude a disproportionate number of Negroes and Caucasians. The 1960 United States Census of Hawaii enumerated 119,634 persons who had lived in the Islands less than five years and 432,147 persons who had a longer period of residence. The former group consisted largely of persons in their 20's and 30's with a heavy predominance of Caucasians. The latter group by contrast had higher proportions under 20 or past 40 years of age with a heavy predominance of non-Caucasians.[22] The same age[23] and ethnic [24] differentials were found by comparing the then existing resident population with corresponding data on intended residents arriving from the Mainland in 1967. That is, 55.8 percent of the new arrivals were between 20 and 40 as compared with 30.6 percent of the then existing residents. It was also found that 10.9 percent of the newcomers were over 40 while 26.4 percent of the residents were in that age category. As to ethnic differences, the estimated distribution for intended residents arriving from the Mainland was 90.1 percent Caucasian, 8.5 percent Negro, and 1.4 percent

---

20 See Table 1 in Appendix. (Table references in this and in following footnotes will always be for more complete statistics and the sources for them.)

21 See Table 2 in Appendix.

22 See Table 3 in Appendix.

23 See Table 4 in Appendix.

24 No direct questions on race are asked of intended residents. However, the state of origin is asked. Therefore, the assumption is made that newly arrived residents are distributed in the same proportions as the 1960 census reported racial composition in those states. See Table 5 in Appendix.

other (Japanese, Chinese, Filipino, Hawaiian, or mixed). By contrast, sample surveys conducted on Oahu in 1964-66 and on the neighbor islands in 1967 showed that 28.6 percent of the resident population was Caucasian, approximately .7 percent Negro, and 70.7 percent other.[25] While there is nothing to indicate that the Legislature ever intended such a result, it is clear that the exclusion which results from the residence requirement systematically precludes a very large group of Negroes and Caucasians from jury service. The number of Negroes and Caucasians affected is greatly disproportionate to the overall population percentages of those groups.

The 1960 census also showed that persons living on Oahu less than five years were better educated than those who had lived on the island longer than five years. 35.1 percent of the former group had had one or more years of college while only 14.9 percent of the latter group had had that much education.[26]

Other large differences were reported as between migrant and non-migrant households on Oahu in a December, 1959 survey by the *Honolulu Star-Bulletin*. Migration status was determined by place of residence one year before the survey date. All household heads who had lived elsewhere than Hawaii one year earlier were classified as "migrants." The others were "non-migrants." The figures show that many more newcomers rent, rather than buy, a home. As tenants, they pay much more for rent and it represents a much higher percent of their income than their non-migrant counterparts. Their households are smaller and they much less frequently live in units with more than 1.5 persons per room than do non-migrants. This survey also shows an educational disparity, with 57.5

---

[25] See Table 6 in Appendix.

[26] See Table 7 in Appendix.

percent of the civilian migrants completing one year of college as against 27.8 percent of the civilian non-migrants. And the civilian migrants have a median family income 15.6 percent higher than the civilian non-migrants.[27]

All of these statistics, of course, do not point up what differences in verdict results, if any, would occur if residents of less than three years were to be permitted to serve on juries. But they do demonstrate in dramatic fashion that a sizable group of short-term residents exists and forms a section of the community different from other portions which include longer term residents. The members of this group are certain to have viewpoints, judgments and modes of thought, all of which are precluded from being reflected on the jury rolls. It is an irrefragable truth that the juries in Hawaii as presently constituted could never accurately represent a cross-section of the community.

## IV.

The Sixth Amendment of the United States Constitution guarantees that "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an *impartial jury*..." (emphasis added). Section 11 of article I of the Hawaii Constitution provides the same guarantee. Because trial by jury in criminal cases is fundamental to the American scheme of justice, the Supreme Court has held that the Due Process Clause of the "Fourteenth Amendment guarantees a right of jury trial in all criminal cases which—were they to be tried in a federal court—would come within the Sixth Amendment's guarantee." *Duncan* v. *Louisiana*, 391 U.S. 145, 149 (1968). Although there may be some ambiguity in the court's opinion in that case (see *The Supreme Court 1967 Term*, 82 Harv. L. Rev. 63, at pp. 148-153 (1968)), my reading of it

---

[27] See Table 8 in Appendix.

leads me to conclude that in cases where a defendant in this State is to be tried before a jury, the Supreme Court's interpretation of the "impartial jury" requirement of the Sixth Amendment as applied in federal cases is now binding on the courts of this State.

The Supreme Court has said that the "American tradition of trial by jury, considered in connection with either criminal or civil proceedings, necessarily contemplates an impartial jury drawn from a cross-section of the community." *Thiel* v. *Southern Pacific Co.,* 328 U.S. 217, 220 (1946). Commentators have given several purposes for the cross-section requirement. (a) The more representative a jury is of society as a whole, the greater respect its judgment carries. (b) The role of the jury mitigates the harsh rule of law by bringing the application of legal doctrine into conformity with contemporary community standards. (c) The cross-section requirement supplements the impartiality requirement in reducing the risk of a biased jury.[28]

Although the officials charged with selecting jurors may exercise some discretion to assure that competent jurors are called, "they must not allow the desire for competent jurors to lead them into selections which do not comport with the concept of the jury as a cross-section of the community." *Glasser* v. *United States,* 315 U.S. 60, 86 (1942). The stated legislative purpose for the jurors' residence requirement refers to the need for a prospective juror to understand the customs and ways of the Hawaiian people[29] and therefore appears to speak to the problem of competency. The statistical discussion above demonstrates, however, that the exclusions which occur prevent the juror selections from comporting with the concept of

---

[28] *The Supreme Court, 1967 Term,* 82 HARV. L. REV. 63 at pp. 165-166 (1968).

[29] See note 11, *supra.*

the jury as a cross-section of the community.

"[*T*]*hose eligible for jury service are to be found in every stratum of society.* Jury competence is an individual rather than a group or class matter. That fact lies at the very heart of the jury system. To disregard it is to open the door to class distinctions and discriminations which are abhorrent to the democratic ideals of trial by jury" (emphasis added). *Thiel* v. *Southern Pacific Co., supra* at 220. The holdings in *Thiel* and *Glasser* rested on the supervisory power of the Supreme Court over the federal courts rather than constitutional doctrine. But the above-quoted language in those cases seems to extend far beyond mere supervision, they go to the very essence of what constitutes trial by jury in a democracy. Furthermore, the importance of the representative nature of the jury has been emphasized in cases involving the composition of state juries, where the Court has referred to the same cross-section requirement as constitutionally mandated. For example, in *Smith* v. *Texas,* 311 U.S. 128, 130 (1940), a case relied upon by *Thiel* and *Glasser,* the Court said:

> It is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community . . . [T]he exclusion from jury service of otherwise qualified groups not only violates our Constitution and the laws enacted under it, but is at war with our basic concepts of a democratic society and a representative government.

And in *Brown* v. *Allen,* 344 U.S. 443, 474 (1953), the Court said:

> Our duty to protect the federal constitutional rights of all does not mean we must or should impose on states our conception of the proper source of jury lists, *so long as the source reasonably reflects a cross-section*

*of the population suitable* in character and intelligence for that civic duty. (Emphasis added.)

State courts have also interpreted the cross-section requirement to be constitutionally prescribed by the Fourteenth Amendment. In *Allen* v. *State*, 110 Ga. App. 56, 137 S.E.2d 711 (1964), the Court of Appeals of Georgia held that a white civil rights worker was deprived of due process and denied equal protection of the law by a jury system that excluded Negroes from jury panels. The court said, "When a State law provides for indictment and trial by jury, due process of law, in our opinion, includes indictment and trial by juries selected in accordance with the established law from a list of citizens representing a cross-section of the community." *Id.* at 65, 137 S.E.2d at 717.

There has been a recent federal case in which the court held that both the equal protection and due process clauses require that the jury represent a cross-section of the community. In *Labat* v. *Bennett*, 365 F.2d 698 (5th Cir. 1966), *cert. denied,* 386 U.S. 991 (1967) the court held unconstitutional the systematic exclusion of daily wage earners as a class from jury service. The court considered unacceptable the explanation for the practice given by the state which had claimed that to force such persons to serve would subject them to an undue financial hardship.

Some cases have held that the exclusion does not impair representativeness if the groups excluded do not have characteristics which differentiate them from the remainder of the community.[30] This is not such a case. Also, this is not a case where certain occupational classes (*e.g.,* lawyers, doctors, or ministers) are excluded on the bona fide ground that it is for the good of the community that their work not be interrupted.[31] Nor is this a case where the

---

[30] See King v. United States, 346 F.2d 123 (1st Cir. 1965) in which the Court held that the exclusion of people between the ages of 21 and 25 does not make the grand and petit jury unrepresentative.

[31] See Rawlins v. Georgia, 201 U.S. 638 (1906).

prerequisites of sanity,[32] a minimum age,[33] literacy,[34] or knowledge of English[35] is being challenged. These latter requirements are all objective prerequisites which go to the essence of the ability to perform the functions of a juror—to see, hear, understand—and, hopefully, to reason. But length of residence appears to be wholly irrelevant to the ability to perform the vital juror functions.

The only relevance length of residence has to jury qualification is the use of it to determine whether the prospective juror does in fact live in the district where the crime was alleged to have been committed.[36] The criteria used in making that determination must, of course, take residence into account to assure that a sufficient nexus between the juror and the district exists. Three years is far too stringent a requirement. It is, in fact, simply arbitrary. This state requires only one year for the new resident to earn the privilege to vote in statewide elections,[37] and it requires only three months' residence to register to vote in a given district.[38] At a minimum, if a person is deemed well acquainted with his adopted home in Hawaii to have a sufficient nexus to vote, he certainly has also a sufficient nexus to serve on a jury.[39] Voting in state elec-

---

[32] See HRS § 609-1(2).

[33] See HRS § 609-1(1).

[34] See HRS § 609-1(4), State v. Comeaux, 252 La. 481, 211 So.2d 620 (1968).

[35] See HRS § 609-1(4), Miranda v. United States, 255 F.2d 9 (1958).

[36] The Sixth Amendment of the United States Constitution provides that the jury be "of the State and district wherein the crime shall have been committed." Section 11 of article I of the Constitution of Hawaii provides similarly that the jury be "of the district wherein the crime shall have been committed."

[37] HRS § 11-4.

[38] Id.

[39] One state court has held that a shorter residence is sufficient to qualify a person for jury duty although a longer period of residency was required for the conferring of political rights and privileges. Anderson v. State, 5 Ark. 444, 454 (1843).

tions requires a much greater degree of intimacy with the State than does jury duty. A voter must pass upon policy questions as well as constitutional amendments which affect Hawaii's future. He must also weigh the differing needs of competing groups whose representatives run for office. All that a juror is required to do is to apply law, as to which he is instructed by the trial judge, to facts which are brought out in his presence.

The Supreme Court has made it clear that exclusions of a class of persons from jury service on grounds other than race or color may constitute a deprivation of equal protection of the laws to a defendant who is a member of the excluded class. *Hernandez* v. *Texas,* 347 U.S. 475, 477 (1954).

The case of *Hoyt* v. *Florida,* 368 U.S. 57 (1961) cited in a quotation in the majority opinion is very appropriate, and supports my position. That case held that one accused of crime is not entitled "to a jury tailored to the circumstances of the particular case . . . ." 368 U.S. at 59. In the present case the defendants do not ask for a tailor-made jury. They ask only that "the jury be indiscriminately drawn from among those [otherwise] eligible in the community for jury service, untrammelled by any arbitrary and systematic exclusions." *Id.*

The majority emphasizes the reasonableness of the residence requirement in its exclusionary effect and the failure of the defendants to make a showing of unreasonableness. Although I believe that I have adequately demonstrated that the reasons underlying the statute are not valid today, even if I were incorrect in my conclusion, the fact that the exclusion exists per se, thereby rendering the jury incapable of being a cross-section of the community, is enough to make the jury array unconstitutional. I am aware of no case authority, and the majority cites none, which holds that a state may exclude from

jury service on "reasonable grounds" bona fide residents of at least a year who otherwise meet every objective age, intellectual, and physical prerequisite prescribed for jury duty and who constitute an important and significant tier in the community structure. The Legislature may find many reasons for a statute, but if the Constitution forbids it, the law is void. In these cases, I believe the State's discretion is limited to requiring a period of residence sufficient to establish a nexus, but not to attempt the transformation of the character and cultural orientation of the new resident.

Although defendants have made no showing of the likelihood of prejudice to them on account of the residence requirement, such a specific showing of prejudice by a defendant is not required. *Thiel* v. *Southern Pacific Co.*, 328 U.S. 217, 225 (1946); *Ballard* v. *United States*, 329 U.S. 187, 195 (1946); *Witherspoon* v. *Illinois*, 391 U.S. 510, 531 (1968) (separate opinion by Douglas, J.); *State* v. *Madison*, 240 Md. 265, 213 A.2d 880 (1965). The reason for this is that differences in the attitudes and beliefs of those excluded are not capable of being measured. The prejudice resulting from the exclusion "is so subtle, so intangible, that it escapes the ordinary methods of proof." *Fay* v. *New York*, 332 U.S. 261, 300 (1947) (dissenting opinion).

The systematic and arbitrary exclusion is clear; the deprivation of the right to a jury drawn from a cross-section of the community has been shown. That the excluded group exists with characteristics differing from longer-term residents is evident from readily available facts of which this court may take judicial notice. It is an indisputable fact that one may never be certain of the "influences that may play and prey unconsciously upon [a] judgment"[40] made by a jury. Because of this uncer-

---

[40] Dennis v. United States, 339 U.S. 162, 183 (1950) (dissenting opinion by Frankfurter, J.).

tainty, it is essential that the whole "environing atmosphere"[41] of the community be reflected in the list of eligible jurors.

The fact that counsel for the defendants has been remiss in not building a record by presenting to the trial court well-known facts such as those set out herein should not deter this court from recognizing the facts which are painfully obvious. We have recently said "The guiding light of this court is the promotion of justice rather than adherence to technicalities which, because of the omissions of counsel, cast an unfavorable light on an otherwise meritorious case." *Low* v. *Honolulu Rapid Transit Co.,* 50 Haw. 582, 585, 445 P.2d 372, 375-76 (1968). This court is not doing justice to these defendants.

I think that the convictions should be vacated and the causes remanded for new trials by properly constituted juries.

---

[41] Frank v. Mangum, 237 U.S. 309, 349 (1915) (dissenting opinion of Holmes, J.).

TABLE 1

POPULATION AND MIGRATION TRENDS, FOR HAWAII:
1960 TO 1968*

| Year | Resident Population[1] | Intended Residents Arriving from Mainland[2] | |
|------|------------------------|----------------------------------------------|---|
| | | Total | Civilian[3] |
| 1960 | 642,000 | 17,970 | ........... |
| 1961 | 661,000 | 14,075 | 10,145 |
| 1962 | 696,000 | 19,455 | 10,490 |
| 1963 | 690,000 | 20,455 | 10,845 |
| 1964 | 717,000 | 22,150 | 12,145 |
| 1965 | 719,000 | 24,240 | 12,320 |
| 1966 | 733,000 | 23,915 | 11,070 |
| 1967 | 760,000 | 33,560 | 15,520 |
| 1968 | 780,000 | 37,495 | 18,320 |

\* Source, Table 1: Resident Population from U.S. Bureau of the Census, *Current Population Reports*, Series P-25, No. 414 (Jan. 28, 1969) and No. 420 (April 17, 1969). Intended residents from Hawaii Dept. of Planning and Economic Development [hereafter DPED], *Hawaii's In-Migrants, 1968* (Statistical Report 65, April 10, 1969), table 2.

[1] Estimated as of July 1.

[2] Years ended June 30. Excludes arrivals by MATS (MAC) and MSTS.

[3] Excludes military personnel and dependents and persons not reporting military status.

TABLE 2

PLACE OF RESIDENCE ONE YEAR EARLIER,
FOR HOUSEHOLD HEADS ON OAHU: 1958 TO 1966*

| Island and Date of Survey | Residence one year earlier (percent distribution) | | | | | |
|---------------------------|-------|--------------------------|-----------|--------------------------|-----------|-------------|
| | | In Hawaii[1] | | Elsewhere[1] | | |
| | Total | Military Personnel | Civilians | Military Personnel | Civilians | Not Reported |
| Island of Oahu: | | | | | | |
| Jan. 1958 | 100.0 | 12.5 | 77.6 | 7.2 | 2.7 | .... |
| Dec. 1958 | 100.0 | 13.7 | 78.9 | 5.1 | 2.1 | 0.1 |
| Dec. 1959 | 100.0 | 13.7 | 76.8 | 6.2 | 3.2 | 0.1 |
| Jan. 1961 | 100.0 | 13.4 | 76.4 | 6.1 | 4.0 | 0.1 |
| Oct. 1961 | 100.0 | 10.7 | 81.5 | 4.4 | 3.0 | 0.4 |
| Oct. 1962 | 100.0 | 11.8 | 78.4 | 6.8 | 2.9 | 0.1 |
| 1966, Annual Avg. | 100.0 | 12.4 | 76.1 | 6.9 | 4.1 | 0.5 |
| Island of Hawaii: | | | | | | |
| Jan. 1961 | 100.0 | 0.5 | 97.6 | 0.2 | 1.2 | 0.4 |

\* Source, Table 2: Hawaii DPED, *Migrant and Non-Migrant Households in Hawaii, January 1961* (Research Report 6, July 19, 1961), table 1, p. 5. Honolulu Redevelopment Agency, *Redevelopment and Housing Research*, No. 21, June 1962, p. 13; No. 23, July 1963, p. 15; and No. 27, July 1967, p. 15.

[1] Classified by military status at time of survey.

TABLE 3
### AGE, SEX, AND COLOR OF MIGRANTS AND NON-MIGRANTS, FOR HAWAII: 1960*
(Migrants defined as persons who lived in Hawaii in 1960 but elsewhere in 1955.)

| Subject | All Persons | Migrants[1] | Non-Migrants | Percent Distribution | | |
|---|---|---|---|---|---|---|
| | | | | All Persons | Migrants[1] | Non-Migrants |
| Population aged 5 years and over | 551,781 | 119,634 | 432,147 | 100.0 | 100.0 | 100.0 |
| Age: | | | | | | |
| 5 to 19 years | 192,471 | 35,909 | 156,562 | 34.9 | 30.0 | 36.2 |
| 20 to 39 years | 192,922 | 67,789 | 125,133 | 35.0 | 56.7 | 29.0 |
| 40 to 59 years | 122,496 | 13,428 | 109,068 | 22.2 | 11.2 | 25.2 |
| 60 years and over | 43,892 | 2,508 | 41,384 | 8.0 | 2.1 | 9.6 |
| Sex: | | | | | | |
| Male | 296,074 | 71,666 | 224,408 | 53.7 | 59.9 | 51.9 |
| Female | 255,707 | 47,968 | 207,739 | 46.3 | 40.1 | 48.1 |
| Color: | | | | | | |
| White | 176,403 | 98,546 | 77,857 | 32.0 | 82.4 | 18.0 |
| Nonwhite | 375,378 | 21,088 | 354,290 | 68.0 | 17.6 | 82.0 |

* Source, Table 3: U.S. Bureau of the Census, *U.S. Census of Population: 1960*, Vol. 1, *Characteristics of the Population*, Part 13, Hawaii, p. 13-52, table 42 and p. 13-121, table 100.

[1] Includes 5,464 persons who moved but for whom place of residence in 1955 was not reported.

TABLE 4
### AGE AND SEX OF THE POPULATION OF HAWAII, APRIL, 1960, AND OF PERSONS MOVING TO HAWAII FROM THE MAINLAND DURING CALENDAR YEAR 1967*

| Subject | Resident Population | Migrants from the Mainland | | Percent Distribution | Migrants from the Mainland | |
|---|---|---|---|---|---|---|
| | | Total | Civilian[1] | Resident Population | Total | Civilian[1] |
| Total | 632,772 | 38,155 | 17,480 | 100.0 | 100.0 | 100.0 |
| Age: | | | | | | |
| Under 20 years | 272,579 | 10,660 | 5,005 | 43.1 | 33.3 | 31.3 |
| 20 to 39 years | 193,340 | 17,875 | 8,610 | 30.6 | 55.8 | 53.8 |
| 40 to 59 years | 121,920 | 3,025 | 2,000 | 19.3 | 9.5 | 12.5 |
| 60 years and over | 44,933 | 450 | 385 | 7.1 | 1.4 | 2.4 |
| Not reported | .......... | 6,145 | 1,480 | ...... | ...... | ...... |
| Sex: | | | | | | |
| Male | 338,173 | 22,230 | 7,870 | 53.4 | 58.3 | 45.0 |
| Female | 294,599 | 15,925 | 9,610 | 46.6 | 41.7 | 55.0 |

* Source, Table 4: U.S. Census of Population: 1960, Vol. 1, *Characteristics of the Population*, Part 13, Hawaii, p. 13-18, table 16. Hawaii DPED, *Hawaii's In-Migrants, 1967*, (Statistical Report 55, April 5, 1968), tables 7 and 11.

[1] Excludes military personnel and dependents and persons not reporting military status.

TABLE 5

IMPLICIT RACE OF INTENDED RESIDENTS IN 1967, BASED UPON 1960 CENSUS RACIAL COMPOSITION IN U.S.

| Subject | New England | Mid-dle Atl. | E.N. Central | West North Cen. | So. Atl. | East So. Cen. | West So. Cen. | Mountain | Alaska | Wash. | Ore. | Calif. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1960 population percentages[1] | | | | | | | | | | | | |
| White | 97.5 | 91.5 | 91.8 | 95.8 | 77.2 | 77.5 | 83.1 | 95.0 | 77.2 | 96.4 | 97.9 | 92.0 |
| | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Negro | 2.3 | 8.2 | 8.0 | 3.6 | 22.5 | 22.4 | 16.3 | 1.8 | 3.0 | 1.7 | 1.0 | 5.6 |
| Other | 0.2 | 0.3 | 0.2 | 0.5 | 0.3 | 0.1 | 0.5 | 3.2 | 19.8 | 1.9 | 1.0 | 2.4 |
| 1967 all intended residents[2] | 1,030 | 2,940 | 3,785 | 2,235 | 2,555 | 955 | 2,125 | 1,700 | 360 | 1,130 | 705 | 7,095 |
| White[3] | 1,004 | 2,690 | 3,474 | 2,141 | 1,972 | 740 | 1,766 | 1,615 | 278 | 1,084 | 690 | 6,528 |
| Negro[3] | 24 | 241 | 303 | 82 | 575 | 214 | 347 | 31 | 11 | 19 | 7 | 397 |
| Other[3] | 2 | 9 | 8 | 12 | 8 | 1 | 12 | 54 | 71 | 22 | 8 | 170 |
| 1967 civilian intended residents[2] | 405 | 1,085 | 1,340 | 630 | 610 | 110 | 385 | 810 | 270 | 610 | 330 | 3,710 |
| White[3] | 395 | 993 | 1,230 | 604 | 471 | 85 | 320 | 769 | 208 | 588 | 323 | 3,413 |
| Negro[3] | 9 | 89 | 107 | 23 | 137 | 25 | 63 | 15 | 8 | 10 | 4 | 208 |
| Other[3] | 1 | 3 | 3 | 3 | 2 | ---- | 2 | 26 | 54 | 12 | 3 | 89 |

| | Total | % | Civ. | % |
|---|---|---|---|---|
| All areas | 26,615 | 100.0 | 10,295 | 100.0 |
| White | 23,987 | 90.1 | 9,399 | 91.3 |
| Negro | 2,251 | 8.5 | 698 | 6.8 |
| Other | 377 | 1.4 | 198 | 1.9 |

[1] U.S. Census of Population: 1960, General Population Characteristics, United States Summary. Final Report PC(1)-1B, Table 56, p. 1-164.

[2] Hawaii's In-Migrants 1967, DPED Statistical Report 55, Table 8 (1968) "Civilian" excludes military personnel and dependents and persons not reporting status.

[3] Based on 1960 population distribution, given above Note 1.

TABLE 6

## RACE OF POPULATION OF HAWAII, 1966, AND OF PERSONS MOVING TO HAWAII, 1967*

| RACE | Resident Population[1] | Migrants from the Mainland[2] | Percent Distribution | |
|---|---|---|---|---|
| | | | Resident Population | Migrants from the Mainland[2] |
| All groups | 741,297 | 38,155 | 100.0 | 100.0 |
| Caucasian[3] | 211,974 | 34,378 | 28.6 | 90.1 |
| Negro | 4,943 | 3,243 | 0.7 | 8.5 |
| Other groups | 524,380 | 534 | 70.7 | 1.4 |
| Chinese | 39,832 | ([4]) | 5.4 | ([4]) |
| Filipino | 58,043 | ([4]) | 7.8 | ([4]) |
| Japanese | 218,826 | ([4]) | 29.5 | ([4]) |
| Other[5] | 207,679 | ([4]) | 28.0 | ([4]) |

* Source, Table 6: Negro population from *U.S. Census of Population: 1960*, Vol. 1, *Characteristics of the Population*, Part 13, Hawaii, p. 13-17 table 15; population data for other races from DPED memorandum of May 14, 1968. Migrants from the Mainland from DPED, *Hawaii's In-Migrants, 1967* (Statistical Report 55, April 5, 1968), table 8, and *U.S. Census of Population: 1960, General Population Characteristics*, United States Summary, Final Report PC (1)-1B, Table 56 p. 1-164; migrants assumed to be distributed by race in proportion to 1960 distribution in population by state of origin. See table 5, *supra*.

[1] Excludes 2,581 not reporting race.

[2] Includes data for 19,255 military personnel and their dependents and 1,370 not reporting military status. Among the 17,530 other migrants, 91.3 percent were Caucasian, 6.8 percent were Negro, and 1.9 percent were from other groups.

[3] Includes Puerto Rican.

[4] Not reported separately; combined total was 506, or 1.4 percent.

[5] Includes Hawaiian, Samoan, Korean, and persons of mixed blood.

## TABLE 7

### EDUCATION, EMPLOYMENT STATUS, AND FAMILY INCOME OF MIGRANTS AND NON-MIGRANTS, FOR OAHU: 1960*

(Migrants defined as persons who lived in Oahu in 1960 but elsewhere in 1955)

| Subject | Total | Non-Migrants[1] | Migrants | Percent Distribution Total | Percent Distribution Non-Migrants[1] | Percent Distribution Migrants |
|---|---|---|---|---|---|---|
| **Years of School Completed** | | | | | | |
| Persons 25 and over | 238,831 | 193,233 | 45,598 | 100.0 | 100.0 | 100.0 |
| 8 years or less | 76,603 | 71,806 | 4,797 | 32.1 | 37.2 | 10.5 |
| 9 to 11 years | 39,833 | 32,854 | 6,979 | 16.7 | 17.0 | 15.3 |
| 12 years | 77,577 | 59,768 | 17,809 | 32.5 | 30.9 | 39.1 |
| 13 to 15 years | 20,499 | 12,772 | 7,727 | 8.6 | 6.6 | 16.9 |
| 16 years or more | 24,319 | 16,033 | 8,286 | 10.2 | 8.3 | 18.2 |
| Median (years) | 12.0 | 11.3 | 12.6 | ......... | ......... | ......... |
| **EMPLOYMENT STATUS** | | | | | | |
| Persons 14 and over | 336,818 | 253,383 | 83,435 | 100.0 | 100.0 | 100.0 |
| Employed | 161,024 | 141,344 | 19,680 | 47.8 | 55.8 | 23.6 |
| Unemployed | 6,401 | 5,073 | 1,328 | 1.9 | 2.0 | 1.6 |
| Pct. of civ. labor force | 3.8 | 3.5 | 6.3 | ......... | ......... | ......... |
| Armed Forces | 46,827 | 10,634 | 36,193 | 13.9 | 4.2 | 43.4 |
| Not in labor force | 122,566 | 96,332 | 26,234 | 36.4 | 38.0 | 31.4 |
| **FAMILY INCOME** | | | | | | |
| Persons 5 and over | 373,928 | 300,152 | 73,776 | 100.0 | 100.0 | 100.0 |
| Under $5,000 | 94,668 | 67,216 | 27,452 | 25.3 | 22.4 | 37.2 |
| $5,000 to $6,999 | 79,125 | 62,939 | 16,186 | 21.2 | 21.0 | 21.9 |
| $7,000 to $9,999 | 90,229 | 75,997 | 14,232 | 24.1 | 25.3 | 19.3 |
| $10,000 or more | 109,906 | 94,000 | 15,906 | 29.4 | 31.3 | 21.6 |
| Median income (dollars) | 7,438 | 7,786 | 6,166 | ......... | ......... | ......... |

\* Source, Table 7: DPED, *Migration Between Hawaii and the Mainland, 1955-1960* (Statistical Report 13, Feb. 15, 1964) table 9.

[1] Includes persons who lived abroad in 1955 and persons who moved but for whom place of residence in 1955 was not reported.

## TABLE 8

CHARACTERISTICS OF HOUSEHOLDS AND DWELLING UNITS,
BY MIGRATION AND MILITARY STATUS OF HOUSEHOLD HEAD,
FOR OAHU: DECEMBER 1959*

(Migrant households are those whose head lived in Hawaii in December
1959 but in a different state or country in Dec. 1958.)

| Subject | All house-holds[1] | Non-migrant households Mili-tary | Civil-ian | Migrant households Mili-tary | Civil-ian |
|---|---|---|---|---|---|
| **HOUSEHOLDS** | | | | | |
| Place of residence (percent) | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Moanalua-Navy Housing | 5.6 | 22.2 | 1.4 | 24.0 | 1.2 |
| Waikiki | 6.6 | 4.4 | 5.8 | 8.4 | 32.5 |
| Remainder of Honolulu | 53.7 | 12.6 | 64.8 | 11.7 | 46.2 |
| Oahu, excl. Honolulu | 34.0 | 60.8 | 28.0 | 55.8 | 20.0 |
| Persons per household | 4.35 | 4.12 | 4.50 | 3.59 | 3.10 |
| Percent under 18 years | 45.8 | 49.6 | 45.6 | 44.1 | 36.7 |
| Percent completed 13th grade[2] | 29.6 | 31.0 | 27.8 | 35.1 | 57.5 |
| Percent working in Honolulu[2] | 55.3 | 14.5 | 65.5 | 9.9 | 70.5 |
| Median family income | $6,055 | $4,617 | $6,404 | $4,659 | $7,400 |
| Automobiles per household | 1.13 | 1.08 | 1.15 | 1.01 | 0.95 |
| **OCCUPIED DWELLING UNITS** | | | | | |
| Percent owner occupied | 47.2 | 9.4 | 58.6 | 3.9 | 17.5 |
| Percent over 1.5 persons per room | 8.0 | 5.6 | 9.1 | 2.6 | 1.2 |
| Percent with 5 or more rooms | 58.9 | 55.8 | 61.6 | 45.5 | 32.1 |
| Percent in 1-unit structures | 63.5 | 36.3 | 71.5 | 35.1 | 42.5 |
| Median year built | 1948 | 1950 | 1947 | 1951 | 1953 |
| Percent dilapidated | 11.3 | 16.7 | 10.6 | 8.5 | 7.5 |
| Median monthly rent[3] | $76 | $86 | $65 | $93 | $116 |
| Rent as pct. of income (median)[3] | 18.7 | 24.2 | 16.1 | 25.8 | 22.2 |

* Source, Table 8: Hawaii Department of Planning and Economic Development, *Migrant and Non-Migrant Households in Hawaii, January 1961* (Research Report 6, July 19, 1961), table 4 p. 8. Based on a survey of 2,500 Oahu households conducted by the *Honolulu Star-Bulletin.*

[1] Includes household heads not reporting migration status.
[2] Refers to head of household.
[3] For renter occupied dwelling units, except rent-free.